John **SAUER, as personal representative of the estate of Delores Gross, and Max Rush, as Court Appointed Trustee of the Bankruptcy Estate of Delores Gross, Appellants,**

v.

The **HOME INDEMNITY COMPANY, d/b/a the Home Insurance Company; Northern Adjusters; Larry Larson, Leroy Darling, Edward Helmic, Phillip Park, Ursula Park, Jane Martin, Carol Guillory, Charles Guillory, and Frances Scott, Appellees.**

No. S–4522.

Supreme Court of Alaska.

Nov. 13, 1992.

Rehearing Denied Dec. 7, 1992.

Michael W. Flanigan, Clark, Walther & Flanigan, Anchorage, for appellants.

Laurence Keyes, Crosby & Sisson, Anchorage, for appellees Home Indem. Co., Northern Adjusters and Larry Larson.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

### I. INTRODUCTION

Delores Gross and Max Rush, the trustee of Gross' bankruptcy estate, sued Gross' insurer, the Home Indemnity Company. The bases of the suit were Home Indemnity Company's refusal to defend or indemnify Gross against claims of residents of her trailer park arising from a sewage leak and Home Indemnity Company's failure to communicate to Gross its denial of a defense or coverage. The trial court denied Gross' motions for summary judgment and granted summary judgment in favor of Home Indemnity Company and the insurance adjusters. John Sauer, the personal representative of the estate of Delores Gross, and Rush appeal.

### II. FACTS AND PROCEEDINGS

In January 1983, sewage backed up at a trailer park owned by Delores Gross.[1] The sewage accumulated and froze to a depth of several inches over a portion of the park. Some residents of the park suffered significant hardship and property damage as a result of the spill.

After a complaint from a resident of the park on January 17, 1983, a health official for the Municipality of Anchorage (MOA) investigated the matter and found sewage pouring from pipes in the ground. On January 25, the MOA brought a public nuisance action to enjoin violations of local health ordinances and seeking civil penalties. Residents Carol Guillory, Charles Guillory, and Frances Scott intervened in the action six days later. Residents Leroy Darling, Edward Helmic, Phillip Park, Ursula Park, Kevin Scott and Jane Martin intervened on December 14, 1983. The MOA eventually dismissed its complaint, leaving the residents as plaintiffs.[2]

At the time of the incident, the trailer park was insured under a comprehensive

---

1. The cause of the spill has never been determined, but several theories exist. Home Indemnity's case is predicated on the theory that the spill was caused by a general deterioration of the sewage system which Gross knew about but ignored. At the time of the spill, Gross informed Home Indemnity's adjuster that the lines were sabotaged by tenants putting rocks or mop heads in the sewer lines. In her briefs on appeal, Gross relies on the theory that the pipes froze unexpectedly during a cold snap. Official records of the National Oceanic and Atmospheric Administration (NOAA) show that, in the four days prior to January 11, 1983, the average daily temperature ranged from −3 to −10 degrees Fahrenheit, which was from 14 to 21 degrees below normal. At her deposition, Gross theorized that the problem arose from freezing in the sewer lines connecting the trailers to the park sewage system and for which the tenants themselves had responsibility. A resolution of this factual issue is not necessary to our decision.

2. On January 26, 1983, the MOA and Gross stipulated to the entry of a temporary restraining order requiring a cut-off of water supply to the affected area, relocation of the affected trailers, cleanup of the sewage, and disinfecting of contaminated areas. MOA dismissed its complaint in June 1985, after a plan was developed which required Gross to pay for the cleanup and disposal of the sewage.

general liability policy issued by the Home Indemnity Company.[3] After the spill, Gross notified her insurance agent of the sewage problem at the trailer park. The agent in turn notified Home Indemnity of the claim on February 4. On the same day, Home Indemnity contacted Larry Larson, an adjuster with Northern Adjusters, and asked him to investigate the cause and extent of the loss and to obtain a non-waiver agreement from Gross. Home Indemnity did not ask Larson to provide an opinion as to coverage.

During his investigation Larson spoke with Gross[4] and her attorney and took photographs of the scene. He did not speak with any of the residents or with MOA officials who inspected the scene, nor did he seek Home Indemnity's approval to enlist outside help to determine the cause of the spill. From his investigation, Larson was unable to determine the cause of the sewage spill, but was also unable to rule out frozen pipes as a possible cause. On February 25, Larson prepared and sent a report to Home Indemnity. The report included copies of MOA's complaint, the temporary restraining order, and the first complaint in intervention (hereinafter, the Guillory complaint). On March 22, Home Indemnity ordered Larson to close the file on Gross' case. Larson did so two weeks later and had no further involvement with Gross' claim.

Before concluding his investigation, Larson proffered a non-waiver agreement to Gross through her attorney, but it was never signed. The non-waiver agreement did not indicate any possible basis for the denial of coverage. Home Indemnity did not assume the defense of Gross in the residents' suit. Although a routine audit of the file by Home Indemnity in August 1983 indicated that a reservation of rights letter should be sent to Gross, no such letter was ever sent. Home Indemnity did not communicate to Gross a decision to deny coverage until nearly five years later, when it filed its counterclaim for declaratory relief in the present action.

The residents' suit was tried on April 10, 1986. Neither Gross nor her attorney were present for the trial.[5] A jury awarded the residents compensatory and punitive damages, and judgment was entered against Gross. The amount of the judgment, including costs, fees and prejudgment interest, exceeded $600,000.

In May 1987, letters of inquiry from Gross' attorney to Home Indemnity prompted Home to review the Gross file. Home Indemnity's review indicated that Gross "submitted property damage claim and liability claim to Home Indemnity under policy" and that Home Indemnity "had no contact since March 83.... File was closed due to inactivity." The review also stated "there is no coverage for this loss. Analysis to follow.... Refer for coverage

---

3. The policy, issued by Home Indemnity to Gross on June 21, 1982, provided that

> [t]he company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as damages because of **bodily injury or property** damage to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any such suit against the **Insured** seeking damages on account of such **bodily injury** or **property damage**....

An "occurrence" is defined as

> an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the Insured....

Under exclusion (f) of the policy, no coverage is provided for

> **bodily injury** or **property damage** arising out of the discharge, dispersal, release, or escape

of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental....

4. Gross claimed Larson told her that "he would take care of and resolve the claims" and that Home Indemnity "would take care of everything."

5. Gross claims that the trial of the residents' action was rescheduled from April 14 to April 10, 1986 without her knowledge. Gross' briefs on appeal raise several questions regarding the validity of the verdict in the residents' action. However, because there was no appeal from that action, we need not address these issues.

opinion." Still no denial of coverage or any other information was communicated to Gross or her attorney.

On April 29, 1988, after filing for bankruptcy, Gross and her bankruptcy trustee brought the instant action against Home Indemnity, Northern Adjusters and Larry Larson. The complaint alleged negligent failure to investigate, adjust, resolve or defend against the claims of the affected residents, and breach of contractual obligations owed to Gross either directly or as an intended third-party beneficiary. Home Indemnity answered and counterclaimed for declaratory relief on the issues of its duties to defend and indemnify Gross.

Gross moved for summary judgment seeking a determination that Home Indemnity was estopped from denying coverage because it failed to defend Gross or notify her of a coverage dispute. Home Indemnity countered with a cross-motion on the estoppel issue. Gross and Home Indemnity also filed cross-motions for summary judgment on the issue of whether the policy afforded coverage for the residents' claims. The trial court denied Gross' motions and granted summary judgment for Home Indemnity, concluding that Home Indemnity was not estopped from denying coverage and that coverage did not lie. Final judgment was entered in favor of Home Indemnity, Larson and Northern Adjusters.

Gross appeals, challenging the denial of her motion for summary judgment and the grant of summary judgment for the defendants.[6]

## III. DISCUSSION

Gross argues that Home Indemnity breached its duty to defend against the residents' claims and that Home Indemnity's failure to timely advise Gross of coverage questions should estop Home Indemnity from denying coverage in the present action. Thus, Gross argues, the superior court erred in denying her summary judgment motion and in granting Home's motion.

A party is entitled to summary judgment when there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. Alaska R.Civ.Pro. 56(c). Here, the record developed on the parties' cross-motions for summary judgment reveals that no genuine issues of material fact exist as to Home Indemnity's liability. Thus we need only review the trial court's decision that Home Indemnity, Larson and Northern Adjusters, rather than Gross, were entitled to judgment as a matter of law. In reviewing the lower court's resolution of a question of law, we must adopt the rule of law which is most persuasive in light of precedent, reason and policy. *CTA v. Active Erectors*, 781 P.2d 1364 (Alaska 1989).

### A. Duty to Defend

An insurer's duty to defend and its obligation to indemnify are separate and distinct contractual elements. *Afcan v. Mutual Fire, Marine and Inland Ins. Co.*, 595 P.2d 638, 645 (Alaska 1979). As we stated in *Afcan*,

Depending upon the nature of the claim against the insured, the insurer may have an obligation to defend although it has no ultimate liability under the policy. We believe that the language of the standard duty to defend clause creates a reasonable expectation on the part of the insured *whenever* a complaint states a cause of action within, or potentially within, the policy coverage.... Thus, even though facts extrinsic to the pleadings may show that there will be no ultimate liability under the policy, if the complaint *on its face* alleges facts which, standing alone, give rise to a possible finding of liability covered by the policy, the insured has the contractual right to a proper defense at the expense of the insurer.

*Id.*

There can be little doubt that Home Indemnity breached its duty to defend Gross in the residents' action. The allegations contained in the Guillory complaint, filed

---

**6.** After Gross' death, John Sauer, as representative of the estate of Delores Gross, was substituted as plaintiff. However, we will refer to the plaintiff as "Gross."

before Home Indemnity began its investigation, clearly alleged facts potentially within the policy coverage. The policy obligated Home Indemnity to pay "all sums which [Gross] shall become legally obligated to pay as damages ... caused by an occurrence." The policy defines an occurrence as "an accident ... which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The Guillory complaint alleged "gross negligence" and that the sewage leak was caused by "clogged or frozen pipes."[7] Such allegations, if proven, would have supported recovery under a negligence theory, which clearly falls within the coverage afforded by the policy. The presence of other allegations in the complaint which are not within policy coverage does not relieve Home Indemnity of its duty to defend. *See Ferguson v. Birmingham Fire Ins. Co.*, 254 Or. 496, 460 P.2d 342, 347 (1969) (where complaint contains counts based upon both covered and uncovered conduct, the insurer has a duty to defend because of allegations falling within policy coverage).

Home Indemnity argues that the policy's pollution exclusion, which excludes coverage for damages arising from a release of pollutants unless such release is "sudden and accidental," absolved Home Indemnity of any duty to defend. We disagree. Without deciding whether the pollution exclusion is applicable to the facts of this case, the discharge of the sewage was at least potentially "sudden and accidental," as that phrase has been interpreted by other courts.[8] The damages suffered by the residents were at least potentially out-

7. The second residents' complaint, filed nearly a year later, contained similar allegations and may have given rise to a duty to defend. The MOA's complaint may also have given rise to a duty to defend. It alleged violations of various provisions of the Anchorage Municipal Code and the Alaska Administrative Code. Such violations could potentially result from unexpected or unintended activity, thus requiring Home Indemnity to defend Gross in the action. However, because we conclude that the Guillory complaint gave rise to a duty to defend, we need not decide whether the other complaints gave rise to such a duty.

8. We have never had occasion to interpret the standard language of the pollution exclusion, nor do we deem it necessary to do so now. However, many other courts have done so. *See generally* William B. Johnson, *Construction and Application of Pollution Exclusion Clause in Liability Insurance Policy*, 39 A.L.R.4th 1047 (1985); 12 George B. Couch, *Couch on Insurance* § 44A:122 (Mark S. Rhodes ed., 2d rev. ed. 1982); 7A John A. Appleman and Jean Appleman, *Insurance Law and Practice* § 4499.05 (Stephen L. Liebo ed., Supp.1991).

Most courts which have interpreted the pollution exclusion consider the phrase "sudden and accidental" to be ambiguous and thus construe it against the insurer to mean "unexpected or unintended." *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1090–92 (Colo. 1991); *Jackson Township Mun. Utils. Auth. v. Hartford Accident & Indem. Co.*, 186 N.J.Super. 156, 451 A.2d 990, 994 (1982). *But see United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 34 (6th Cir.1988) ("sudden and accidental" is clear and plain language which "only a lawyer's ingenuity could make ambiguous"). As the Supreme Court of Georgia noted it is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, "sudden" does not usually describe the duration of the event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, its spring. *Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 380 S.E.2d 686, 688 (1989). A discharge of sewage over several days or a few weeks, as occurred in the present case, can easily be seen as "sudden" when compared to the seven or eight years of coal dust discharge that occurred in *Star Fire Coals*, 856 F.2d at 35, but may not be considered sudden when compared to an instantaneous spill.

Some cases say that the pollution exclusion "was solely meant to deprive active polluters of coverage." *See, e.g., United Pacific Ins. v. Van's Westlake Union*, 34 Wash.App. 708, 664 P.2d 1262, 1266 (App.1983) (quoting *Niagra Cy. v. Utica Mut. Ins. Co.*, 103 Misc.2d 814, 427 N.Y.S.2d 171 (N.Y.Sup.Ct.1980)). *See also Star Fire Coals*, 856 F.2d at 35 ("such pollution exclusion clauses apply to the release of wastes and pollutants taking place on a regular basis or in the ordinary course of business"). This interpretation is lent further support by the fact that new pollution exclusion language was drafted in 1985 which eliminated the "sudden and accidental" language and "shifts the emphasis to industrial sites." 1 W. Freedman, *Richards on the Law of Insurance* § 5:2[d] (6th ed. Supp.1991). Though we do not decide this issue, this interpretation would preclude application of the pollution exclusion to Gross as a matter of law.

side the scope of the pollution exclusion and thus potentially within policy coverage, necessitating a duty to defend.

Home Indemnity cannot escape its contractual duty to defend its insured merely by choosing to accept a version of the facts or an interpretation of the policy which it finds most favorable. Because the Guillory complaint alleges a claim potentially within the policy coverage, Home Indemnity was precluded as a matter of law from looking to extrinsic facts to escape its duty to defend Gross against the residents' claims. *See Afcan*, 595 P.2d at 645.

### B. Estoppel

Gross contends that the trial court erroneously denied her motion for summary judgment on the estoppel issue. Gross argues that, because Home Indemnity breached its duty to defend and failed to timely notify her that it was denying a defense and coverage, Home Indemnity is estopped from contesting coverage in this action. We agree.

■ An insurer is required to give the insured "such notice of its intention to deny liability and of its refusal to defend as will give the insured a reasonable time to protect himself." 7C John A. Appleman, *Insurance Law and Practice* § 4686 (1979). Such notice must not only be prompt, but it must "provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim." AS 21.36.125. Prompt notice of the basis for the denial of coverage or a defense is necessary to avoid prejudice to the insured which may result from delays in the insured undertaking its own defense or from delays in gathering evidence essential to successfully challenge the denial of coverage or a defense.

■ Home Indemnity points to investigator Larson's tender of the non-waiver agreement to Gross as the only evidence of its communication to Gross of a coverage question. It concedes that "[o]therwise, the Home's decision that the claims were not covered was not communicated to Gross, nor did the Home undertake her defense in [the residents' action]." The form non-waiver agreement tendered by Home Indemnity through Larson did not state that Home Indemnity was denying coverage or a defense, nor did it specify any basis for a denial of a defense or coverage. The mere tender of such a non-waiver agreement is insufficient to meet an insurer's obligation to the insured when the insurer decides to deny coverage or a defense. The trial court correctly stated that the first time Home Indemnity informed Gross in writing that it was asserting a coverage defense was in its July 1988 counterclaim for declaratory judgment on the issue of coverage, over five years after Gross filed her claim with Home Indemnity![9] Home Indemnity not only breached its duty to defend, but it failed to promptly communicate its denial of a defense and coverage or any basis for such denial.

■ Where an insurer is in doubt as to either its duty to defend or as to the scope of coverage, its legal options and obligations are, for the most part, clear. First, it may provide a defense unconditionally. In such case, the doctrines of waiver and estoppel ordinarily preclude the insurance company from later contesting coverage. 7C John A. Appleman, *Insurance Law and Practice* § 4692 (1979). Second, with the consent of the insured, the insurance company may conduct the defense conditionally under either a non-waiver agreement with its insured or pursuant to a reservation of rights letter. *See, e.g., Afcan*, 595 P.2d at 642; *Aetna Casualty & Sur. Co. v. Prestige Casualty Co.*, 195 Ill.App.3d 660, 142 Ill.Dec. 689, 691–92, 553 N.E.2d 39, 41–42 (Ill.App.1990). Under either a non-waiver agreement or a reservation of rights letter the insurance company can preserve its option to later disclaim coverage after conducting the defense. *See Afcan* at 642, 644–47.

■ However, if the insured does not consent to a non-waiver agreement, or to a defense under a reservation of rights, then

---

**9.** The record does not support the trial court's finding that Home Indemnity informed Gross' attorney that it was denying coverage and a defense.

the insurance company must choose whether it wishes to defend unconditionally or pursue other options. One such option is to permit the insured to exercise its right to reject the defense offered by the insurer and to obtain substitute counsel at the insurer's expense. In the event the defense is conducted by substitute counsel, the insurance company retains the right to later contest policy coverage. *See Continental Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 291 n. 17 (Alaska 1980).

▮▮▮ A second option available to the insurance company is to refuse to defend or to withdraw from the defense. If the case involves a so-called policy defense—such as failure of the insured to give notice or to cooperate—the insurance company preserves its right to litigate such defenses when this option is exercised. *Continental*, 608 P.2d at 291. When the case involves a so-called coverage question—typically where one or more of the claims is excluded from coverage under the policy—the consequences of withdrawal on the part of the insurer are more complex. This is because the insurer has a separate contractual duty to defend which may apply even though the insurance company has no ultimate liability under the policy. *Afcan*, 595 P.2d at 645.[10] We indicated in *Afcan* that, in a case where the allegations in the complaint include grounds for relief both within and beyond policy coverage, an insurance company which withdraws its defense in breach of its obligation to defend is liable for the reasonable costs and attorney's fees incurred by the insured in the defense of the claim, but it is not barred from attempting to show in a subsequent action the loss is not within policy coverage. In *Afcan*, the insurance company clearly communicated its decision to withdraw from the defense of the case and explained to the insured the basis of its decision. Further, the loss in *Afcan* was determined by settlement, not after a trial. Although one may legitimately question whether this limitation is warranted, there is no occasion to do so in this case as the liability of Gross was not established by settlement, but by a jury verdict.

▮▮▮ Where, as here, the insurer does not communicate its decision to withdraw or explain the basis for its decision but simply denies coverage, it should be precluded from later arguing that coverage under the policy did not exist. *See Bellefonte Ins. Co. v. Wayson*, 489 F.Supp. 58 (D.Alaska 1980) (interpreting Alaska law, court held insurer who breached duty to defend without responding to claim of insured was precluded from contesting coverage in subsequent action on policy and was liable for entire amount of jury verdict against insured, including punitive damages. "It is not for [the insurer] to contest coverage at this late date when its breach forced the [insured] to take up its own defense and incur liability in the process."). As noted above, an insurance company is under a duty to notify its insured of its intention to deny liability and to state the grounds therefore. *Supra*, p. 182. Such notice is essential so that the insured may promptly undertake its own defense and evaluate whether to contest the insurance company's decision to deny coverage.

The thrust of Home Indemnity's argument is that it should be permitted to abandon its insured in the face of a lawsuit over potentially covered claims and later, in the insured's action on the policy, to benefit from any factual or legal issues determined in the earlier litigation. This argument borders on audacity. *See Murray v. Feight*, 741 P.2d 1148, 1153 (Alaska 1987) (non-mutual collateral estoppel not allowed where unusual or exceptional circumstances of prior adjudication would make it unfair to allow a person who was not a party to the first judgment to invoke res judicata or collateral estoppel). We hold, as a matter of law, that Home Indemnity may not contest coverage in Gross' action on the policy, and that it is liable for the entire amount of the judgment entered against Gross, as well as costs and attor-

---

**10.** The duty to defend arises "whenever a complaint states a cause of action within, or potentially within, the policy coverage." *Afcan*, 595 P.2d at 645. *See also National Indemnity Co. v. Flesher*, 469 P.2d 360, 366 (Alaska 1970).

ney's fees incurred in the defense of the residents' action.

■ This holding is mandated on the authority of *Theodore v. Zurich Gen. Accident & Liab. Ins. Co.*, 364 P.2d 51 (Alaska 1961). In *Theodore* we stated in part:

> Since Zurich had the obligation to defend and refused to do so, the judgment became binding against it both as to the extent and existence of liability. Therefore, it did not have the right, when appellants brought this suit on the judgment, to show that the death of Arthur Theodore was not caused by the employee's liability section of the policy.

*Id.* at 56. Thus, an insurance company which wrongfully refuses to defend is liable for the judgment which ensues even though the facts may ultimately demonstrate that no indemnity is due. *E.g., St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 240 (4th Cir.1990); *Schurgast v. Schumann*, 156 Conn. 471, 242 A.2d 695 (1968); *Sims v. Illinois Nat'l Casualty Co.*, 43 Ill.App.2d 184, 193 N.E.2d 123, 127–30 (1963). The trial court erred in denying Gross' motion for summary judgment against Home Indemnity[11] and in granting summary judgment for Home Indemnity.[12]

### C. Summary Judgment for Adjusters

Gross argues that the superior court erred in granting summary judgment for Northern Adjusters and Larson. We agree.

Gross' complaint alleges that Home Indemnity and the adjusters negligently failed to "investigate, adjust, resolve or defend" the residents' claims. In *Continental Ins.*, 608 P.2d at 287–88, we recognized that an insurance adjuster owes a duty of care to the insured which is independent of any contractual obligation arising out of the insurance policy, and that a breach of this duty is actionable. Since

there was no motion before the court concerning the adjusters' liability, separate from that of Home Indemnity, and the record does not otherwise demonstrate the adjusters' right to summary judgment, the grant of summary judgment for the adjusters was improper.

REVERSED and REMANDED for entry of judgment against Home Indemnity and for further proceedings in accordance with this opinion.

---

**11.** Because Gross' summary judgment motion on the estoppel issue was directed only against Home and not against Northern Adjusters and Larson, and because the adjusters were not parties to the insurance contract, *see Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 157 Cal. Rptr. 482, 490, 598 P.2d 452, 460 (1979), this portion of our opinion does not apply to the adjusters.

**12.** Because we conclude that Home is barred from contesting coverage, we need not address the issue of whether the policy provided coverage for the claims of the residents.