C.P. By and Through her next friend, M.L., M.L., individually, and D.B., Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY and Sheryl Norton, Defendants.

Nos. S–8606, 5245.

Supreme Court of Alaska.

March 3, 2000.

Rehearing Denied April 28, 2000.

---

Steven Lewis Hempel, Juneau, for Plaintiffs.

Gregory W. Lessmeier, Lessmeier & Winters, Juneau, and Peter J. Valeta and Jeffrey A. Berman, Ross & Hardies, Chicago, Illinois, for Defendants.

Bruce P. Babbitt, Jameson, Babbitt, Stites & Lombard, P.L.L.C., for Amicus Curiae J.D. Glass & Door, Inc.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

The adult son of homeowners assaulted a child visiting their home. The child and her parents sued the homeowners, claiming they negligently caused her injuries. Invoking exclusions for intentional and criminal acts, the homeowners' liability insurer refused to defend. The homeowners settled with the claimants and assigned their rights against their insurer, and the child's family then sued the insurer and its adjuster. The United States District Court for the District of Alaska, where that suit is pending, has asked us to answer certified questions of state law: (1) does the insurer's salaried claims adjuster owe tort duties to the insureds; (2) does the insurance policy cover claims that the homeowners negligently failed to do things that would have protected the child; and (3) does a declaration of no coverage affect the insurer's liability under the policy? Applying our existing case law, we answer "yes" to the first question. We also answer "yes" to the second question, because the insurance policy did not unambiguously withhold coverage for claims alleging that the homeowners acted negligently, and that their own conduct, not derivative of their adult son's, was a legal cause of injury. Having found coverage, we do not reach the third question.

### II. FACTS AND PROCEEDINGS

Dolan and Eleanor Lancaster were homeowners who resided in their home with their adult son, Harold Lancaster, and Harold's daughter, C.L.[1] C.P., an eleven-year-old friend of C.L., spent the night of November 11, 1995, with C.L. in the Lancaster home. C.P.'s parents did not know that Dolan and Eleanor were out of town that night and that Harold Lancaster was staying at the house. While C.P. was at the Lancasters' home,

---

[1] We rely here on the federal court's fact statements and the excerpt. We make no independent fact determinations.

Harold Lancaster physically and sexually assaulted her.

Allstate Insurance Company had issued a homeowner's insurance policy to Dolan and Eleanor Lancaster. The policy covered liability for bodily injury "arising from an accident," and required Allstate to defend the insureds against covered claims. It excluded coverage for injury resulting from intentional or criminal acts. It also contained a "joint obligations" clause.

In December 1995 C.P. and her parents sued Harold, Dolan, and Eleanor for personal injury. The complaint alleged that Harold assaulted C.P., causing injury to her. It also alleged that the elder Lancasters were negligent (in failing to disclose Harold's presence or his alleged propensity to assault children and in failing to watch over C.P.), and that "[a]s a direct and proximate result" of the elder Lancasters' negligence, the plaintiffs suffered damages.[2] The claims against the elder Lancasters were based on their alleged negligence, and did not attempt to attribute Harold's acts to them.

The elder Lancasters tendered to Allstate the defense of C.P.'s claims against the elder Lancasters. Allstate assigned Sheryl Norton, a salaried Allstate employee, to investigate C.P.'s claims. Norton in turn consulted attorney Mark Wilkerson. Wilkerson raised doubts about coverage which Norton relayed to her superiors. Allstate then denied coverage and notified all three Lancasters that it would not defend them against C.P.'s claims.

In April 1996 Dolan and Eleanor Lancaster entered into a settlement agreement with C.P. Per the agreement, Dolan and Eleanor confessed judgment to C.P. and agreed that the amount of C.P.'s damages would be arbitrated. Dolan and Eleanor also assigned to C.P. the right to assert the elder Lancasters' claims against Allstate and permitted C.P. to continue to pursue claims against Harold. C.P. agreed not to collect damages from Dolan and Eleanor except as necessary to prosecute the assigned claims. The claims went to arbitration; the Lancasters did not appear and offered no evidence. The arbitrator found Dolan and Eleanor's liability to be $474,330.

C.P. sued Allstate on the elder Lancasters' assignment. After proceedings not relevant here, Chief Judge James K. Singleton of the United States District Court for the District of Alaska issued a certification order asking us to answer three questions of state law. We quote the questions below. Summarized, they concern the potential tort duties of Allstate's adjuster, Allstate's coverage obligations, and the effect of a declaration of no coverage.

We accepted certification of these three questions.[3]

III. *DISCUSSION*

A. *Standard of Review*

■ The certified questions are questions of law. To answer them, we adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[4]

B. *Does an Insurer's Salaried Adjuster Owe the Insureds a Tort Duty of Reasonable Care?*

■ The district court first poses this certified question:

Does a salaried employee in the claims department of an insurance company owe

---

2. The certification order characterizes the claims against the elder Lancasters as claims for "negligent failure to warn and negligent failure to provide a safe environment on the insured premises." The second certified question describes the suit as one for negligent supervision of the adult son, negligent failure to warn C.P.'s parents, and negligent failure to protect a visitor. The federal court's characterization of the claims is not critical to our analysis.

3. Alaska Rule of Appellate Procedure 407(a) provides:

The supreme court may answer questions of law certified to it by the Supreme Court of the

United States, a court of appeals of the United States, [or] a United States district court ... when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state.

4. *See City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1176 (Alaska 1998) (concerning certified questions); *D.D. v. Insurance Co. of N. Am.*, 905 P.2d 1365, 1367 n. 3 (Alaska 1995) (same).

those who are insured by the company a duty enforceable in a tort action against the employee personally to exercise reasonable care in connection with claims by the insureds that are assigned to the employee for investigation, evaluation and adjustment, to avoid interfering with the insureds' rights under the policy of liability insurance to receive a defense and indemnity against tort claims made against them by third-parties?

C.P. argues that Alaska law already recognizes a cause of action against liability insurers' adjusters for negligent adjustment (including investigation and evaluation) of a claim. C.P. relies on two cases—*Continental Insurance Co. v. Bayless & Roberts, Inc.*[5] and *Sauer v. Home Indemnity Co.*[6]—to support her contention. Amicus J.D. Glass & Door, Inc. supports C.P.'s contention.

Allstate contends that an insured's claims for negligent adjustment are contract claims which can only be made against Allstate itself. (Allstate also contends that the settlement agreement permitted C.P. to sue only Allstate, and that the Lancasters' assignment does not cover suits against Norton. We do not consider this contention because it is not part of the certified question.)

The *Continental* line of cases answers the broad question posed. The Continental Insurance Company discovered midway through its defense of its insured, Bayless & Roberts (B & R), that B & R had changed its story as to the facts of the third-party liability claim being litigated.[7] When Continental refused to defend B & R further, B & R sued it and its claims adjuster, Arthur Stanford.[8]

Stanford held the title of branch manager at the Underwriters Adjusting Company.[9] But we recognized that Underwriters Adjusting was a subsidiary of Continental Corporation and functioned as the claims department of Continental Insurance Company, another subsidiary.[10] We also concluded that Stanford was "Continental's claims adjuster"[11] and that "Continental assigned the adjustment of the ... claim against B & R to Stanford."[12]

B & R's suit against Stanford alleged that "Stanford breached his fiduciary duty in *failing to adequately investigate*" the claim in question, and in failing to fully inform B & R, Continental, and Continental's attorney of the facts of the case.[13] Stanford contended that "he had no duty to B & R under his contract with Continental that would subject him to personal liability."[14] We concluded that "Stanford could not be held liable for a breach of the fiduciary duty of good faith arising out of the insurance contract, but he could be held liable for negligence arising out of a breach of the general tort duty of ordinary care."[15]

Allstate argues that *Continental* is "legally and factually inapplicable here" because it concerned a "third party adjuster," not an "employee" of the insurer, and it concerned defense of a claim, not negligent "investigation." But we treated Stanford as though he were the insurer's employee,[16] and the suit dealt directly with Stanford's allegedly negligent investigation.[17]

Allstate alternatively contends that two cases we decided after *Continental—O.K. Lumber Co. v. Providence Washington Insurance Co.*[18] and *Alaska Pacific Assurance*

**5.** 608 P.2d 281 (Alaska 1980).

**6.** 841 P.2d 176 (Alaska 1992).

**7.** *See Continental,* 608 P.2d at 284–85.

**8.** *See id.* at 285–86.

**9.** *See id.* at 287.

**10.** *See id.*

**11.** *Id.* at 285.

**12.** *Id.* at 287.

**13.** *Id.* at 286 (emphasis added).

**14.** *Id.* at 287.

**15.** *Id.* We also noted that "[t]his conclusion is consistent with our decision in *Austin v. Fulton Insurance Co.,* 498 P.2d 702 (Alaska 1972)." *Id.* at 287–88.

**16.** *See id.* at 285–87.

**17.** *See id.* at 286.

**18.** 759 P.2d 523 (Alaska 1988).

*Co. v. Collins*[19]—"clearly dictate a finding that the employee is not personally liable." C.P. asserts that *Sauer* dictates the opposite result.

Both cases Allstate cites are inapposite, and each undercuts Allstate's argument. In *O.K. Lumber*, Providence Washington insured two companies that caused property damage to O.K. Lumber.[20] When O.K. Lumber sued the two companies, Providence Washington defended them. In one suit, O.K. Lumber recovered a substantial judgment that exceeded what Providence Washington had unsuccessfully offered to pay. In the other, Providence Washington eventually paid O.K. Lumber's entire claim. O.K. Lumber then sued Providence Washington for bad faith.[21] We held that third parties cannot maintain a cause of action against insurers for bad faith: "An insurer could hardly have a fiduciary relationship both with the insured and a claimant because the interests of the two are often conflicting."[22]

*O.K. Lumber* is distinguishable because Providence Washington's insureds had not assigned their rights to O.K. Lumber. But we recognized there that "[t]he insured's cause of action for breach of the implied covenant is assignable to the injured third party claimant."[23] Because C.P. is the assignee of the insureds' rights against their insurer, she is suing as a first party, not as a third party. *O.K. Lumber* therefore supports C.P.'s claim.

*Collins* is also distinguishable, but nonetheless supports C.P.'s claim. The insured there sued his liability insurer for bad faith failure to provide a defense, and the jury found for the insured.[24] Although we reversed the verdict because a jury instruction had erroneously assumed facts not stipulated, we took pains to reaffirm that "it was proper for the superior court to permit [the insured] to sue on the implied covenant of good faith and fair dealing in tort...."[25]

C.P. refers us to *Sauer*, in which Delores Gross was sued by residents of her trailer park.[26] She notified her liability insurer, Home Indemnity, which retained Larry Larson, an adjuster with Northern Adjusters.[27] Larson investigated and sent a report to Home Indemnity; Home Indemnity then apparently forgot about the claim.[28] Gross eventually filed for bankruptcy, and sued Larson, Northern Adjusters, and Home Indemnity for "negligent failure to investigate, adjust, resolve or defend" her claim.[29]

Summary judgment was entered against Gross. We reversed, noting: "In [*Continental* ] we recognized that an insurance adjuster owes a duty of care to the insured which is independent of any contractual obligation arising out of the insurance policy, and that a breach of this duty is actionable."[30] But we also noted that "there was no motion before the court concerning the adjusters' liability, separate from that of Home Indemnity, and the record does not otherwise demonstrate the adjusters' right to summary judgment...."[31]

*Continental*, which involved an adjuster whom we treated as a direct employee of the insurer, and *Sauer*, which involved an independent adjuster, establish that an insurer's adjusters personally owe duties to an insured under a liability policy to adjust (investigate and resolve) claims against the insured. *O.K. Lumber* and *Collins* confirm that proposition.

Does it matter that Norton was Allstate's salaried employee? *Continental* broadly indicates that it does not.

---

**19.** 794 P.2d 936 (Alaska 1990).

**20.** *See O.K. Lumber,* 759 P.2d at 524–25.

**21.** *See id.* at 525.

**22.** *Id.* at 526.

**23.** *Id.* at 525.

**24.** *See Collins,* 794 P.2d at 940.

**25.** *Id.* at 947.

**26.** *See Sauer,* 841 P.2d at 178.

**27.** *See id.* at 179.

**28.** *See id.* at 179–80.

**29.** *Id.* at 180.

**30.** *Id.* at 184.

**31.** *Id.*

The certification order suggests that Restatement (Second) of Torts § 766C (1979) might convince us to draw a distinction between salaried employees and independent adjusters. Section 766C bars recovery for nonphysical harm resulting from interference with contract. Because the parties' briefs have not addressed the Restatement issue, we decline to address § 766C here.[32]

Thus, existing Alaska law answers the first question. The answer is "yes": the insurer's salaried insurance adjuster owes the insureds the described duty of care.

C. *Does the Insurance Policy Cover Claims that the Homeowners Negligently Failed to Prevent a Child from Being Harmed by Criminal or Intentional Acts?*

The second certified question asks:

Does a homeowner's liability insurance policy that provides coverage against "accidental" injuries and excludes coverage for intentional and criminal acts (whether or not prosecuted), treats the acts of one insured as the acts of all insureds, and promises to defend the homeowner against suits for "covered damages" even if the allegations are groundless, false or fraudulent, obligate the insurer to defend and indemnify an insured homeowner who is sued for (1) negligent supervision of an adult son who resides on the premises and allegedly sexually assaulted a young guest of his daughter's (the homeowner's granddaughter) on the insured premises, (2) negligent failure to warn the parents of the injured child that the adult son would be left in charge of the premises during an extended absence by the homeowners, and (3) negligent failure to protect a visitor lawfully on the premises from foreseeable criminal activity, i.e., a sexual assault by a resident?

■ Well-known principles of insurance contract interpretation govern our analysis. The liability of an insurer is generally determined by the terms of the policy it has issued.[33] Where an insurance company by plain language limits the coverage of its policy, we recognize that restriction.[34] But because an insurance policy is a contract of adhesion, we construe it to give effect to the insured's reasonable expectations.[35] In other words, "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." [36]

■ Construction of an insurance policy under the principle of reasonable expectations does not depend on a prior determination of policy ambiguity.[37] But where a clause in an insurance policy is ambiguous in the sense that it is reasonably susceptible to more than one interpretation, we accept the interpretation that most favors the insured.[38]

**32.** We note that we have rejected the distinction between physical and economic losses which seems to underlie § 766C. *See Mattingly v. Sheldon Jackson College*, 743 P.2d 356, 360 (Alaska 1987). And although we have not previously discussed § 766C, we have declared that agents can be held personally liable for their independent tortious acts. *See Griffith v. Taylor*, 937 P.2d 297, 308 (Alaska 1997) (holding attorney potentially liable for independent torts committed while working for firm); *Barber v. National Bank of Alaska*, 815 P.2d 857, 861–63 (Alaska 1991) (holding mortgage collection employee potentially liable for negligence and misrepresentation committed while working for bank).

**33.** *See Jones v. Horace Mann Ins. Co.*, 937 P.2d 1360, 1362 n. 3 (Alaska 1997).

**34.** *See Insurance Co. of N. Am. v. State Farm Mut. Auto. Ins. Co.*, 663 P.2d 953, 955 (Alaska 1983). *See also* AS 21.42.230 (providing "[e]ach insurance contract shall be construed according to the entirety of its terms and conditions as set

out in the policy and as amplified, extended, or modified by a rider, endorsement, or application that is a part of the policy").

**35.** *See Jones*, 937 P.2d at 1362 n. 3 (quoting *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1294–95 (Alaska 1994)).

**36.** *Bering Strait Sch. Dist.*, 873 P.2d at 1295 (quoting Robert Keeton, *Basic Text on Insurance Law* § 6.3(a), at 351 (1971)).

**37.** *See Stordahl v. Government Employees Ins. Co.*, 564 P.2d 63, 66 (Alaska 1977).

**38.** *See Starry v. Horace Mann Ins. Co.*, 649 P.2d 937, 939 (Alaska 1982). An ambiguity does not exist, however, merely because the parties disagree as to the interpretation of a term. An ambiguity exists only where the contract as a whole and all the extrinsic evidence support two different interpretations, both of which are rea-

In order to determine the reasonable expectations of the parties, we look to the language of the disputed policy provisions, the language of other provisions of the insurance policy, relevant extrinsic evidence, and case law interpreting similar provisions.[39] We construe grants of coverage broadly and interpret exclusions narrowly.[40]

### 1. Coverage for "accident"

The family liability coverage part of Allstate's policy covered "an insured person" against liability claims for "bodily injury ... arising from an accident." It provides: "Subject to the terms, limitations and conditions of this policy, Allstate will pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an accident and covered by this part of the policy."

This part also imposed defense duties on Allstate: "If an insured person is sued for [covered damages], we will provide a defense ... even if the allegations are groundless, false or fraudulent." Harold, Dolan, and Eleanor Lancaster are "insured persons" under Allstate's policy. There is no dispute about whether C.P. suffered "bodily injury" as the policy defines that term.

Allstate first argues that there is no coverage because C.P.'s damages arise not from an "accident," as that word is used in the liability coverage part, but from Harold's non-accidental acts. Allstate reasons that the elder Lancasters' purported negligence was only "an antecedent contributing circumstance," and "not the proximate cause of the loss." In essence, Allstate reasons that because Harold's conduct caused C.P. to suffer injury, it is irrelevant that his parents' independent conduct also allegedly contributed causally to the loss. C.P. argues that from the elder Lancasters' perspective, "this was an accidental loss," and cites in support the arbitrator's finding to that effect.

The policy does not define "accident."[41] Nor does it specify whether we are to apply the term subjectively—from the perspective of either the insured claiming coverage or the victim—or objectively.[42] Absent contract language clearly specifying an objective perspective, our practice of enforcing the insured's reasonable expectations requires us to determine whether the loss was the result of an accident from the perspective of the insureds claiming coverage.

From the standpoint of the elder Lancasters, it is not unreasonable that their interpretation of the policy focuses on the acts C.P. attributed to them, as distinct from the acts she attributes to Harold. They were sued for their conduct, not Harold's. C.P. did not attempt to make them vicariously liable for Harold's acts. Rather, her complaint alleged that the elder Lancasters' negligence legally caused injury to her. To prevail against them on that theory, C.P. had to prove that her injuries resulted from their negligence, i.e., from unintended or unexpect-

---

sonable. *See Modern Constr., Inc. v. Barce, Inc.,* 556 P.2d 528, 529 (Alaska 1976).

**39.** *See Stordahl,* 564 P.2d at 66.

**40.** *See Hahn v. Alaska Title Guar. Co.,* 557 P.2d 143, 145 (Alaska 1976); *Starry,* 649 P.2d at 939.

**41.** In ordinary usage, "accident" is commonly defined to mean

"[a]n unexpected and undesirable event...." *Webster's II New Riverside University Dictionary* 71 (1994). Black's Law Dictionary states: "An accident within accident insurance policies is an event happening without any human agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens." *Black's Law Dictionary* 15 (6th ed.1990). A leading insurance encyclopedia states, "an accident is a distinctive event that is unforeseen and unintended, which takes place at a date which can be fixed with reasonable certainty." 9 *Couch on Insurance* § 126:26 (3d ed.1999) (citations omitted). In Alaska we have adopted a broad definition of accident based on "the reasonable understanding or expectations of the average person: if in common parlance an 'accidental result' is an 'accident,' the accidental results should be covered." *INA Life Ins. Co. v. Brundin,* 533 P.2d 236, 240 (Alaska 1975).

**42.** One encyclopedia states: "Most courts employ an objective standard to determine whether injury was intentional. In accordance with this view, an act of sexual abuse is regarded as intentional where injury is the natural and probable consequence of the insured's actions." 9 *Couch on Insurance* § 127:26. But other courts apply a subjective standard. *See id.* (citing cases utilizing subjective standard). *See also Black's Law Dictionary,* at 15, defining "accident."

ed consequences of their conduct, regardless of whether there was more than one cause of her injuries.[43] Thus, their liability was effectively contingent on proof that an "accident" was a cause of harm to C.P.

Allstate's argument that the Lancasters' negligence was only "a" cause and not "the proximate cause" of C.P.'s injuries is unavailing. The policy covers claims for injury "arising from an accident." That language does not incorporate any requirement that an accident have been "*the* proximate cause." Nor does it foreclose coverage if an accident was only "a" cause. The language "arising from" is consistent with multiple causes. It is also consistent with our case law that recognizes in a tort context that a claimant need only prove that a breach of duty is "a" proximate cause of harm, not "the" proximate cause.[44]

Only a few cases appear to have dealt with this precise issue and identical policy language.[45] In *Allstate Insurance Co. v. Worthington,*[46] the Tenth Circuit, applying Utah law, found coverage where a man took hostages at a hospital and fatally wounded a nurse. The man's ex-wife (Brown) was sued for negligently entrusting weapons to him and failing to warn the victims.[47] *Worthington* reasoned that neither the policy's intentional and criminal act exclusions nor its joint obligations clause barred coverage for the negligence claims against Brown.[48] Further, the court held that the allegations against her constituted an "accident" under the policy's terms, even if her ex-husband's acts were intentional.[49]

The Eighth Circuit reached the opposite conclusion in *Allstate Insurance Co. v. Steele.*[50] In that case, a sixteen-year-old boy raped his twelve-year-old stepsister while she was visiting her father and stepmother.[51] The victim's mother asserted a negligent supervision claim against the father and stepmother.[52] The court, applying Minnesota law, reasoned that under the insurance policy's exclusions and joint obligations clause, one insured's intentional act barred coverage for claims against other insureds for negligent supervision.[53] Further, the court found that the stepbrother's intentional and criminal sexual conduct was not an "accident" within coverage provisions of the policy.[54]

Allstate argues that *Worthington* is unpersuasive, and, moreover, is now contrary to Utah law.[55] We nonetheless find its reasoning more persuasive and more consistent with the principles that govern insurance coverage disputes in Alaska.

Reading the liability coverage language in isolation, we consequently reject Allstate's "accident" argument and hold that C.P.'s claims against the elder Lancasters were within the liability coverage part.

2. *The exclusions and the joint obligations clause*

The coverage language was potentially subject to other relevant policy provisions: the criminal and intentional act exclusions and the joint obligations clause. The intentional act exclusion excluded coverage for bodily injury "resulting from ... an act or omission intended or expected to cause bodi-

---

**43.** *See* 9 Couch on Insurance § 126:27.

**44.** *See, e.g., Buoy v. ERA Helicopters, Inc.,* 771 P.2d 439, 445 (Alaska 1989); *Bakke v. State,* 744 P.2d 655, 656 (Alaska 1987).

**45.** Allstate refers us to *Allstate Insurance Co. v. Roelfs,* 698 F.Supp. 815 (D.Alaska 1987). Applying Alaska law, the court there held that the intentional injury caused by one insured bars coverage for claims of negligence against other insureds. *See id.* at 822. But the policy language in *Roelfs* differs from the Lancasters' policy language. *Roelfs* therefore does not assist our analysis of the present policy.

**46.** 46 F.3d 1005, 1012–13 (10th Cir.1995).

**47.** *See id.* at 1007.

**48.** *See id.* at 1010.

**49.** *Id.*

**50.** 74 F.3d 878 (8th Cir.1996).

**51.** *See id.* at 880.

**52.** *See id.*

**53.** *See id.* at 881.

**54.** *Id.* at 880.

**55.** *See State Farm Fire & Cas. Co. v. Geary,* 869 P.2d 952, 954 (Utah App.1994).

ly injury." [56] The criminal act exclusion excluded coverage for bodily injury "resulting from . . . a criminal act or omission." [57] The joint obligations clause is found in the policy's "insuring agreement." The joint obligations clause provides: "The terms of this policy impose joint obligations on persons defined as an insured person. This means that the responsibilities, acts and failures to act of a person defined as an insured person will be binding upon another person defined as an insured person."

■ Allstate argues that both exclusions apply because C.P.'s injuries resulted from Harold's intentional and criminal acts. Further, it argues that the joint obligations clause attributes the conduct of one insured person—Harold—to the other insured persons—the elder Lancasters, thus confirming that the exclusions apply to the claims against Dolan and Eleanor. It consequently does not matter to Allstate that only Harold's conduct was intentional or criminal and that the elder Lancasters' unintentional and non-criminal acts may also have been a causal factor in C.P.'s injuries.

C.P. does not deny that she was injured as a result of Harold's intentional or criminal acts. But she contends that the Lancasters' negligence also caused her injuries, and that their negligence should be treated independently for purposes of determining coverage. Her claims against the elder Lancasters allege their direct liability and are based on her theory that they negligently breached duties they owed to her. Her claims do not attempt to make the elder Lancasters vicariously liable for Harold's intentional and criminal actions. According to her, the relevant question is "what coverage does the policy provide, or possibly provide, for losses resulting from a combination of both covered and excluded causes?" She asserts that the policy does not unambiguously exclude her claims because the exclusions do not explicitly exclude coverage for a claim "which results partly or entirely from an excluded cause, regardless of the cause, causes, or combination of causes of the loss."

The district court correctly noted that there is "[p]ersuasive but conflicting authority" in other jurisdictions regarding the effect of such policy language in context of injuries allegedly caused by both negligent acts and intentional or criminal acts. It also correctly noted that we have considered the effect of "multiple causation" in cases resolving insurance disputes, but not in a case involving a joint obligations clause. Finally, the court recognized that Allstate's policy contains no "severability of interest" clause that would clearly limit the effect of an exclusion to the person claiming coverage. [58]

Allstate refers us to cases applying similar policy language and holding that innocent insureds are not covered in comparable circumstances. [59] C.P. seeks to distinguish these cases. Some of these cases cannot be distinguished; they involve policy terms that are substantially identical to the terms of Allstate's policy here. [60]

Our analysis here focuses on the policy's language and our case law. The district

---

**56.** Exclusion 1 addresses intentional acts. It provides in pertinent part:

> We do not cover bodily injury or property damage resulting from:
> a) an act or omission intended or expected to cause bodily injury or property damage. This exclusion applies even if the bodily injury or property damage is of a different kind or degree, or is sustained by a different person or property, than intended or expected; or
> b) an act or omission committed by an insured person while insane or while lacking the mental capacity to control his or her conduct. . . .

**57.** Exclusion 2 addresses criminal acts. It provides in pertinent part:

> We do not cover bodily injury or property damage resulting from:

> a) a criminal act or omission; or
> b) an act or omission which is criminal in nature and committed by an insured person who lacked the mental capacity to appreciate the criminal nature or wrongfulness of the act or omission. . . .

**58.** *Cf. State v. Underwriters at Lloyds, London,* 755 P.2d 396, 399–400 (Alaska 1988); *Marwell Constr., Inc. v. Underwriters at Lloyd's, London,* 465 P.2d 298, 305 (Alaska 1970).

**59.** *See, e.g., Steele,* 74 F.3d at 880–81; *Castro v. Allstate Ins. Co.,* 855 F.Supp. 1152, 1154 (S.D.Cal.1994).

**60.** *See Steele,* 74 F.3d at 880–81; *Castro,* 855 F.Supp. at 1154–55.

court has not referred us to any extrinsic evidence relevant to the contracting parties' expectations.

■ The exclusions do not resolve the question presented here: is there coverage for a loss claimed to have resulted from a combination of covered and uncovered conduct? Instead, they specify the types of injury to be excluded: injury resulting from criminal or intentional conduct.[61] In doing so, they do not expressly exclude injury caused in part by both unintentional or non-criminal conduct. The terms can be interpreted broadly to exclude the resulting harm even if negligence was a contributing cause, or they can be read narrowly to apply only to injuries caused solely by intentional or criminal conduct. We must interpret exclusions narrowly.[62] And our discussion above concerning coverage for an "accident" applies equally here. From the perspective of insureds whose acts are alleged to have negligently, but not criminally or intentionally, been a cause of a claimant's injury, these exclusions do not apply to the negligence claims against them. Likewise, with respect to C.P., the elder Lancasters' alleged conduct was allegedly negligent, and therefore neither intentional nor criminal. It thus triggered neither exclusion.

The broad exclusionary reading Allstate urges is permissible. But we conclude that reading the exclusions narrowly is more consistent with the insureds' reasonable expectations that they will be covered against claims that they negligently caused injury.

*Worthington*, which interpreted identical policy language, supports this conclusion. The court there declined Allstate's invitation to focus only on the intentional act or "under-lying cause" of the complainant's injury.[63] Instead, the court focused on the actual allegations of negligence against the nonacting insured and reasoned that this negligence constituted an "accident" under the policy terms and that the policy's intentional act exclusion was inapplicable to these claims.[64]

■ We next consider the effect of All-state's joint obligations clause. We assume for discussion's sake that Allstate is correct in asserting that this clause has the effect of attributing Harold's intentional and criminal conduct to the elder Lancasters.[65] But, for two reasons, this attribution does not resolve the issue of whether the exclusions apply to the negligence claims against the elder Lancasters. First, it is not clear how the joint obligations clause even bears on the exclusionary language critical here. The pertinent language of the intentional act exclusion, Exclusion 1.a),[66] seems to apply without regard to who has acted intentionally. In comparison, Exclusion 1.b)[67] applies only to acts of "an insured person." If it does not matter for purposes of Exclusion 1.a) whether an insured person was the intentional actor, the joint obligations clause, which attributes Harold's acts to the elder Lancasters, is not relevant to Exclusion 1.a) either. That means that the exclusion must be interpreted without reference to the joint obligations clause.

Second, if the joint obligations clause does apply to this exclusion, it does not resolve the multiple-cause problem discussed above. Attributing Harold's alleged conduct to the elder Lancasters still leaves open the possibility that the injury was the result of both intentional and negligent acts. Allstate had to

---

**61.** In *Hale v. Fireman's Fund Insurance Co.*, 731 P.2d 577, 579 (Alaska 1987), we discussed an exclusion denying coverage for bodily injury "arising out of the ownership, maintenance, operation, use, loading or unloading of (1) any automobile ... owned or operated by ... any insured." We held there that the policy contained the exclusion to preclude coverage for the exact type of loss involved in that case. *See id.* at 581. But that case did not involve multiple alleged causes. *See id.*

**62.** *See State v. Arbuckle*, 941 P.2d 181, 184 n. 3 (Alaska 1997); *Whispering Creek Condominium*

*Owner Ass'n v. Alaska Nat'l Ins. Co.*, 774 P.2d 176, 178 (Alaska 1989).

**63.** *Worthington*, 46 F.3d at 1010.

**64.** *Id.*

**65.** *But cf. id.* at 1009 (finding that identical "joint obligations clause" refers only to affirmative duties to make payments and pay premiums).

**66.** *See supra* note 56.

**67.** *See supra* note 56.

take the complaint's allegations as true, and had to assume that the elder Lancasters' negligent acts or omissions were at least a contributing cause of C.P.'s injuries. Simply attributing Harold's intentional conduct to the elder Lancasters does not clearly and unambiguously withdraw coverage for C.P.'s claim that the elder Lancasters' negligent, unintentional conduct injured her.

A similar analysis applies to the pertinent criminal act exclusion, Exclusion 2.a). Again, the joint obligations clause does not clearly apply to this exclusion because it is not unambiguously limited to the acts of insured persons.[68] And again, the joint obligations clause does not deal unambiguously with multiple causes of injury.

We conclude that the attribution is irrelevant to either exclusion where the claims against the insureds who claim coverage are based on their negligent, unintentional, non-criminal conduct.

A provision in a different part of Allstate's policy supports our conclusion that the joint obligations clause does not unambiguously resolve the problem of multiple causation. The property loss coverage part contains this exclusion:

> We do not cover loss to the property ... resulting in any manner from:
>
> . . . .
>
> 7. One or more of the items listed below, if that item is one of two or more causes of a loss and if the other causes(s) of the loss is (are) excluded by this policy:
>
>> a) Conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault.

This exclusion makes it clear that there is no coverage for property losses in cases of multiple causes where all of the causes are excluded under the policy. Moreover, this clause defines one class of excluded losses in terms of a cause, which, even though it could be covered if it acted alone, is excluded because it combines with a cause of loss expressly excluded by the policy. This clause therefore has the effect of excluding losses in multi-cause situations. This clause demonstrates that Allstate knew how to address this multi-cause problem when it wanted to. No equivalent provision is to be found in Allstate's liability coverage. The joint obligations clause does not address this issue.

The property coverage part provides a second interesting comparison. It covers a "direct loss" caused by some events which are otherwise excluded.[69] The policy defines "direct loss" to include a loss caused by a named peril if it "is the last in time to occur when the loss is caused by more than one peril." This definition again demonstrates that Allstate knew how to deal with losses with multiple causes, in this example by using a last-in-time approach.

We have held that the presence of a multi-cause exclusion is significant.[70] In *State Farm Fire & Casualty Co. v. Bongen*,[71] we held that a multi-cause exclusion was not ambiguous and that "an insurer may expressly preclude coverage when damage to an insured's property is caused by both a covered and an excluded risk." [72] The clause in *Bongen* expressly and unambiguously resolved the problem presented by a loss that was caused in part by both a covered cause and an excluded cause.[73]

---

68. The text of Exclusion 2.a) itself does not require that the criminal act have been committed by an insured person. Although Exclusion 2 is subject generally to a caveat that it applies regardless of whether "the insured person is actually charged with, or convicted of, a crime," that general caveat may be intended to apply only when it is an insured person who acts criminally. If so, when a person who is not an insured acts, there must be a conviction. We conclude that the joint obligations clause does not unambiguously cause this exclusion to deny coverage for negligent contributing causes.

69. *See, e.g.,* Section I Coverage A Exclusion 1, which contains an exception providing: "[w]e do cover *direct loss* caused by fire explosion or theft resulting from water damage."

70. *See State Farm Fire & Cas. Co. v. Bongen,* 925 P.2d 1042 (Alaska 1996).

71. 925 P.2d 1042 (Alaska 1996).

72. *Id.* at 1045.

73. *See id.* at 1043. The clause read in pertinent part:

The Lancasters' policy contains no equivalent clause in its liability coverage part. Its use of analogous clauses in the property loss coverage part demonstrates that Allstate knew how to phrase an exclusion unambiguously when it wished to address multiple causes. An insured familiar with the entire policy could reasonably conclude from the absence of a similar clause in the liability coverage part that Allstate was not attempting to exclude multiple causes with respect to the intentional and criminal act liability exclusions.

Both sides discuss the efficient proximate cause doctrine in passing. Allstate argues that we have never adopted the doctrine in Alaska and that, in any event, it must yield to unambiguous policy provisions. It also argues that Harold's conduct, not that of the elder Lancasters, was the efficient cause of the loss. In *Bongen* we considered the "efficient proximate cause" rule, which we described as follows:

> "[W]hen a loss is sustained by a sequence or concurrence of at least two causes, one covered under [an insurance] policy and the other excluded under the policy, the cause setting the chain of events in motion is the cause to which the loss is attributed...." Other courts have defined efficient proximate cause to mean the predominant cause, rather than the cause which is first in time.[74]

We decided "to recognize the efficient proximate cause rule only when the parties have not chosen freely to contract out of it." [75]

We held there that the unambiguous policy terms excluded the loss.[76] Justice Matthews, dissenting, stated that "it seems correct to conclude that we have impliedly accepted the efficient proximate cause doctrine. Moreover, as noted, the efficient proximate cause doctrine is widely accepted among American jurisdictions. There is no reason not to accept it in Alaska." [77]

Allstate and the Lancasters did not contract out of the efficient proximate cause rule, but that does not mean that it applies here in order to defeat coverage. The doctrine is a court-made rule applied to preserve insureds' reasonable expectations.[78] If a policy is ambiguous because it can be interpreted reasonably both to cover and not to cover particular losses, there is no reason to invoke the efficient proximate cause rule because the ambiguous policy terms must be interpreted in favor of coverage. Perhaps the rule would apply if the claimant has asserted that the insured seeking coverage has acted both intentionally and negligently. Consider, for example, an insured homeowner who unjustifiably points a loaded pistol at a visitor, who then flees in fright and is injured when he falls on the homeowner's negligently maintained icy steps. What is the predominant cause of the injury, the criminal assault or the negligent maintenance? But C.P.'s complaint does not claim that the elder Lancasters' acts were both negligent and intentional or criminal. And Allstate does not suggest that they knew Harold had any propensity to assault children and that their conduct was in fact intentional.[79] According-

We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of [the following].

*Id.*

74. *Id.* at 1043 n. 1 (quoting *Schroeder v. State Farm Fire & Cas. Co.*, 770 F.Supp. 558, 561 (D.Nev.1991)).

75. *Id.* at 1045 (quoting *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1277 (Utah 1993)).

76. *See id.*

77. *Id.* at 1049 (Matthews, J., dissenting).

78. *See id.* at 1052 (Matthews, J., dissenting); *Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 257 Cal.Rptr. 292, 770 P.2d 704, 710–11 (1989); *Kish v. Insurance Co. of N. Am.*, 125 Wash.2d 164, 883 P.2d 308, 312 (1994). *See also* 2 Eric Mills Holmes, *Holmes's Appleman on Insurance 2d* § 6.2 (1996).

79. *Cf. Worthington*, 46 F.3d at 1009–10. Construing the evidence most favorably to C.P., the district court stated in its certification order that

ly, we see no reason to apply the efficient proximate cause rule here.[80]

We conclude from the language of the entire policy that Allstate did not clearly and unambiguously exclude coverage for the claims that the elder Lancasters negligently contributed to C.P.'s injuries. We therefore hold that Allstate's policy covered C.P.'s claims against the elder Lancasters.

### D. What Is the Effect of a Declaration of Coverage or Non–Coverage?

Finally, the district court asks:

Where an insurer obtains a declaratory judgment against the insured determining that the policy of insurance does not cover a liability asserted against the insured in a personal injury action, does this judgment terminate the insurer's duty to defend the insured in the personal injury action both retroactively and prospectively? In other words, does the duty to defend survive a judicial determination that the underlying claim was not within the terms of the policy, and if not, does the successful assertion of a coverage defense in the declaratory judgment action eliminate any liability for failing to provide a defense while the issue of coverage was being determined? If the duty to defend does survive a determination that there was no duty to indemnify, or if a successful insurer is still liable for failing to provide a defense during the interim while the issue of coverage was undecided, what is the measure of damages for breach of the duty to defend in such a case?

This question perceptively raises intriguing issues about the effect of a successful coverage defense, and the procedural implications of parallel lawsuits litigating personal injury and declaratory relief coverage disputes.[81] But these issues are moot because our answer to the second question establishes that Allstate's policy covered C.P.'s claims against the elder Lancasters. That necessarily means that Allstate materially breached its contractual duties by failing to defend the elder Lancasters against C.P.'s claims and by anticipatorily denying a duty to indemnify them. Our reported cases thoroughly discuss the legal effects of a liability insurer's material breach of duties it owes its insureds.[82] We therefore need not answer the third certified question.

## IV. CONCLUSION

We therefore answer "yes" to Questions One and Two. We decline to answer Question Three, because it is mooted by our answer to Question Two.

---

the elder Lancasters knew Harold was an alcoholic, "but they had no specific advance notice that Harold might sexually molest a child."

**80.** Cf. Mutual of Enumclaw v. Wilcox, 123 Idaho 4, 843 P.2d 154, 159 (1992) (finding injuries caused by molestation, not negligent failure to supervise).

**81.** One significant question is the effect of a final judgment of liability resulting from breach of the defense duty notwithstanding a subsequent declaration that the policy did not cover the claim. See Amato v. Mercury Cas. Co., 53 Cal.App.4th 825, 61 Cal.Rptr.2d 909, 914 (1997) (finding that insurer who wrongfully refuses to defend must pay full default judgment even if claim was not covered by policy); cf. Grace v. Insurance Co. of

N. Am., 944 P.2d 460, 468 (Alaska 1997) (finding that insurer had no duty to defend but that evidence that insurer had taken position that it had no duty to indemnify until limits of insured's underlying policies were actually paid created fact issue as to whether insurer anticipatorily repudiated policy).

C.P. argues that the arbitration award conclusively established the issues of negligence, causation, and damages, and binds Allstate. The district court did not certify this issue to us, and we need not reach it in answering the first two certified questions.

**82.** See, e.g., CHI of Alaska v. Employers Reinsurance, 844 P.2d 1113, 1115–16 (Alaska 1993); Sauer, 841 P.2d at 181–84; Klondike Indus. Corp. v. Gibson, 741 P.2d 1161, 1167 (Alaska 1987).