**CAPITOL INDEMNITY CORPORATION,**
Plaintiff,

v.

**William WRIGHT, et al., Defendants.**

No. CV–S–1602LRHLRL.

United States District Court,
D. Nevada.

Sept. 29, 2004.

James Silvestri, Pyatt & Silvestri, Chtd., Las Vegas, NV, for Plaintiff.

Robert Kossack, Kossack Law Offices, Terry Coffing, Marquis & Aurbach, Robert Kossack, Kossack Law Offices, Las Vegas, NV, for Defendant.

*ORDER*

HICKS, District Judge.

## I. INTRODUCTION

This declaratory judgment action involves coverage questions arising out of the defense of a tort action [1] (hereinafter "Underlying Action") in the state District Court, in Clark County, Nevada. This action was brought by Capitol Indemnity Corporation ("Plaintiff" or "Insurer") for a declaration of its liability under a policy of

insurance (the "Policy") issued to the named insured, EQUITY ENTERPRISES d/b/a The OakLeaf, to cover it for certain risks attendant in operating a group home facility.

Pending before the Court is Defendant Joseph Forte's Motion to Dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6), or, in the alternative, Motion for Summary Judgment (Docket No. 7) filed pursuant to Fed. R.Civ.P. 56(c). For the reasons set forth below, the Defendant's Motion for Summary Judgment (Docket No. 7) will be granted in part.

## II. BACKGROUND FACTS

The background facts of this action are disturbing, to say the least. In short, Joseph Forte filed a complaint, by and through the Clark County Public Administrator, for damages in state court against the insured, Equity Enterprises as well as other associated parties. Forte alleges that Equity Enterprises, Inc., owned and operated a group home called "The Oakleaf" during all times relevant to the Underlying Action. Joseph Forte was a resident at The Oakleaf. While Joseph Forte resided at The OakLeaf facility, he was in his mid 80s and allegedly suffered from diminished mental faculties, including dementia and Alzheimer's Disease. Equity Enterprises bought a commercial general liability Policy from the Plaintiff Capitol Indemnity Corporation for The OakLeaf facility. Defendant Equity Enterprises retained Senior Connections, LLC to manage The OakLeaf facility for Equity Enterprises. Richard A. Smith was the principal member of Senior Connections.

During Forte's stay at The OakLeaf, Richard Smith forged Forte's signature on a document purporting to authorize Nevada State Bank to allow Richard Smith to

1. The Underlying Action is identified as *Forte v. Smith, et al.*, A440434.

be a signatory on all of Mr. Forte's bank accounts. Richard Smith then withdrew the sum of $452,699.98 from Mr. Forte's bank accounts. Richard Smith deposited the vast majority of these funds in the bank account of Senior Connections, LLC. Eventually, the conversion of Mr. Forte's substantial wealth was discovered. Richard Smith executed a written confession admitting to this misappropriation of Forte's funds, pleaded guilty, and was convicted of Exploitation of the Elderly in violation of Nev.Rev.Stat. 200.5099, in state court in Clark County, Nevada.

Some procedural history might be helpful at this point. A number of the parties in the Underlying Action filed a Motion to Dismiss Forte's complaint, which the Clark County District Court considered as a Motion for Summary Judgment and granted on November 20, 2001. On November 28, 2001, Forte filed a Motion for Reconsideration, which the court denied on January 4, 2002. On December 17, 2002, Forte appealed the district court's decision to the Nevada Supreme Court. On June 5, 2003, The Nevada Supreme Court reversed the district court's granting of summary judgment as to Equity Enterprises and affirmed as to Foster and Wright.

On February 6, 2003, before the Nevada Supreme Court issued its ruling on the granting of summary judgment as to Equity Enterprises, Joseph Forte died. On February 11, 2003, pursuant to Nev. R. Civ. P. 25, Forte, by and through Clark County Public Administrator Kathleen Buchanan, filed a Suggestion of Death upon the record. On April 16, 2003, Forte filed a Notice of Substitution of Real Party in Interest, substituting Clark County Public Administrator Dan Ahlstrom ("Ahlstrom") for Buchanan, as and for the person and estate of Joseph Forte. On July 2, 2003, Forte, by and through Ahlstrom, filed a Motion to Substitute Representative Parties. It appears from the limited record

before this Court, that due to the appeal pending before the Nevada Supreme Court, no further action appears to have been taken.

On December 22, 2003, while Forte's appeal was pending, Plaintiff Capitol Indemnity Corporation filed the instant action for Declaratory Judgment. Plaintiff properly served the complaint on all named Defendants.

In the instant action, Plaintiff named Joseph Forte, by and through Clark County Public Administrator Kathleen Buchanan, as a Defendant. However, it is apparent that Mr. Forte was deceased at the time Plaintiff filed this action. Nevertheless, acceptance of service of the summons and complaint was acknowledged on behalf of Joseph Forte by the Clark County Public Guardian. It appears that the confusion over who was representing the interests of the late Mr. Forte was brought about by the Underlying Action being stayed while the appeal to the Nevada Supreme Court was pending. The Clark County Public Administrator Dan Ahlstrom, as represented by his counsel of record, Nursing Home Justice Center, is the proper party representing the interests of Joseph Forte's estate before this Court. The Court hereby substitutes him accordingly.

## III. STANDARD OF REVIEW

Defendant Forte has filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), or, in the alternative, Motion for Summary Judgment (Docket No. 7) pursuant to Fed. R.Civ.P. 56(c). A federal district court must convert a 12(b)(6) motion to one for summary judgment under Rule 56 when the parties submit, and the court does not reject, material beyond the pleadings. Fed.R.Civ.P. 12(b)(6); *Portland Retail Druggists Association v. Kaiser Foundation Health Plan*, 662 F.2d 641, 645 (9th

Cir.1981); *Fernandez v. GE Capital Mortgage Services, Inc.*, 227 B.R. 174, 180 (9th Cir.BAP 1998). As the Court has relied on the materials submitted beyond the pleadings, the Court will decide the Defendant's motion as a motion for summary judgment.

A motion for summary judgment is a procedure that terminates, without a trial, actions in which "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A summary judgment motion may be made in reliance on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Id.*

The movant is entitled to summary judgment if the nonmoving party, who bears the burden of persuasion, fails to designate " 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, to preclude a grant of summary judgment, the nonmoving party must set forth " 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)(quoting Fed.R.Civ.P. 56). The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All justifiable inferences must be viewed in the light most favorable to the nonmoving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001) (citing *Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348).

Although the nonmoving party has the burden of persuasion, the party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Metro Indust., Inc. v. Sammi Corp.*, 82 F.3d 839, 847 (9th

Cir.1996). That burden is met by showing an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to set forth specific facts demonstrating that there is a genuine issue for trial. *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, the nonmoving party must go "beyond the pleadings and by its own evidence present specific facts showing that there is a genuine issue for trial." *Far Out Prod. v. Oskar*, 247 F.3d 986, 997 (9th Cir.2001)(citing *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996)) (quotations omitted).

## IV. DISCUSSION OF POLICY COVERAGE

The basic question in need of determination in this action is the Plaintiff's liability, if any, under the Policy it issued to Equity Enterprises. The Underlying Action alleges five causes of action, which include: (1) breach of contract, (2) fraud, (3) conversion, (4) negligent supervision and retention, and (5) negligence. However, Defendant Forte concedes that for purposes of this action, the relevant claims by Forte in the Underlying Action are (1) breach of contract, (2) negligent supervision and retention, and (3) negligence.

Naturally, as jurisdiction is invoked upon diversity of citizenship in this case, this Court is bound to apply the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Strassberg v. New England Mutual Life Ins. Co.*, 575 F.2d 1262 (9th Cir.1978). Thus, Nevada law controls.

■■■ Nevada courts apply fundamental tenets of insurance law to the interpretation of insurance contract language. Under Nevada law, an insurance policy is a contract of adhesion. *Harvey's Wagon*

*Wheel v. MacSween,* 96 Nev. 215, 219–20, 606 P.2d 1095, 1098 (1980). As such, a policy should be interpreted broadly, affording the greatest possible coverage to the insured. *Id.* Ambiguity in an insurance contract must be interpreted against the drafting party and in favor of the insured. *Neumann v. Standard Fire Ins.,* 101 Nev. 206, 209, 699 P.2d 101, 104 (1985), *citing Yosemite Ins. Co. v. State Farm Mut.,* 98 Nev. 460, 653 P.2d 149 (1982).

■■ However, in spite of these axioms, a Nevada court will not rewrite contract provisions that are otherwise unambiguous. *Farmers Ins. Group v. Stonik,* 110 Nev. 64, 67, 867 P.2d 389, 391 (1994). In addition, a Nevada court will not increase an obligation to the insured where such was intentionally and unambiguously limited by the parties. *Senteney v. Fire Ins. Exchange,* 101 Nev. 654, 707 P.2d 1149 (1985); *see also Farmers Ins. Group,* 110 Nev. at 67, 867 P.2d 389. Finally, in construing an insurance contract "the terms of the parties should be taken and understood in their plain, ordinary and popular sense." *Richfield Oil Corp. v. Harbor Insurance Company,* 85 Nev. 185, 452 P.2d 462, 466 (1969).

### 1. Policy

The Plaintiff argues that the Policy issued to Equity Enterprises does not afford coverage for the claims in the Underlying Action. Specifically, Plaintiff argues that a number of exclusions contained in the Policy exclude coverage for criminal (intentional) acts and for acts of conversion or misappropriation of another's funds or property.

As the language in the Policy is clear and unambiguous, and Defendant Forte concedes that his relevant claims for purposes of this action are limited to breach of contract, negligent supervision and retention, and negligence, the Court finds that Plaintiff Capitol Indemnity has no liability in regards to the fraud and conversion alleged in the Underlying Action.

### 2. Breach of Contract, Negligent Supervision and Retention, and Negligence

Plaintiff's Policy issued to Equity Enterprises provides coverage for "bodily injury" or "property damage" which are caused by an "occurrence." The Policy defines "occurrence" as "any accident, including continuous or repeated exposure to substantially the same general harmful conditions." Plaintiff argues that Richard Smith did not commit any "occurrence" as defined by the Policy; rather, Richard Smith committed an intentional criminal act for which he was convicted. According to Plaintiff, because these acts were intentional, coverage is excluded under an express provision of the Policy. Defendant Forte responds by arguing that the Policy should afford coverage regardless of the exclusionary clauses. In support of this response, the Defendant has identified a number of issues, one of which appears to be valid.

Without providing clear argument or citation to binding or persuasive authority, the Defendant notes that the exclusions in the Policy issued by Plaintiff are so broad that they "effectively 'swallow' the policy itself." Thus, Defendant states, "the broad criminal acts exclusion provision of the policy essentially protects Plaintiff from having to pay on claims at will." There is no dispute that Richard Smith committed an intentional criminal act. However, as Defendant apparently recognizes, the pertinent question for our purposes is whether Richard Smith's intentional acts are a basis for excluding coverage for all of the underlying claims against the insured, Equity Enterprises.

■ To determine Plaintiff's liability, if any, the Court looks to Nevada insurance

law. As far as this Court can determine, and the parties apparently agree with this determination, this issue is one of first impression in Nevada. As noted, jurisdiction in this action is based on diversity of citizenship and the Court is bound to apply the substantive law of Nevada. *Erie R.,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; *Strassberg,* 575 F.2d 1262. Where there is an absence of controlling Nevada law, however, the Court must use its best judgment in predicting how the Nevada Supreme. Court would decide the substantive issues. *See Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *modified,* 810 F.2d 1517 (1987); *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980). In performing this function, the Court may be aided by reviewing well-reasoned decisions from other jurisdictions. *Id.*

As previously stated, under coverage of the Policy the Plaintiff agreed to pay damages for which "the insured" becomes legally liable because of "property damage" caused by an "occurrence." The term "occurrence" is defined to mean "an accident...."

Under a section of the Policy captioned "WHO IS AN INSURED," the Policy lists a corporation (such as Equity Enterprises) as well as its "executive officers" and directors "but only with respect to their duties as [the company's] officers or directors." The Policy affords similar coverage to employees, who are recognized as having "insured" status "but only for acts within the scope of their employment ... or while performing duties related to the conduct of [the named insured's] business."

██ There is no dispute that Richard Smith's acts were based on intentional conduct and not an "occurrence" as defined in the Policy. Therefore, inasmuch as Plaintiff argues its case regarding Richard Smith, it is correct that the Policy affords him no coverage for damages arising from his conduct as an employee or agent of the corporation.

██ The relevant question here, however, is whether Plaintiff's Policy precludes coverage of Equity Enterprises for its alleged negligent supervision and retention of Smith, and its alleged negligence and breach of contract. Plaintiff claims it does preclude such coverage, arguing any loss suffered by the victim Joseph Forte resulted from Richard Smith's intentional conduct, not an accidental "occurrence." The Court does not agree. The nature of the claims in the Underlying Action must be examined and any coverage determined from the perspective of the insured. As to this, Defendant argues that the damages arose from alleged negligent supervision and negligent retention of Richard Smith by Equity Enterprises, not Richard Smith's criminal (intentional) conduct.

This means that any damages attributable to Equity Enterprises were accidental, that is, unexpected and unintended from Equity Enterprises' perspective as a named insured. The Court finds the following language from a federal court in the Central District of California very instructive: "[A]n 'accident' exists when any aspect in the causal series of events leading to the injury or damages was unintended by the insured and a matter of fortuity.... Even if the insureds had personally engaged in the intentional wrongful conduct, if they had also negligently allowed others to engage in that same conduct, the negligence would still constitute an accident." *Keating v. National Union Fire Ins. Co.,* 754 F.Supp. 1431, 1440–41 (C.D.Cal.1990), *rev'd on other grounds* 995 F.2d 154 (9th Cir.1993).

Moreover, Plaintiff's argument that Richard Smith's criminal (intentional) acts exclude coverage is not consistent with the pertinent language of the Policy it issued to Equity Enterprises. The Policy's "Ex-

clusions" section states that it specifically applies to loss "expected or intended from the standpoint of the insured." The Plaintiff does not allege that the insured Equity Enterprises committed any intentional misconduct. Furthermore, from the facts before this Court it is clear that a reasonable trier of fact could find that Equity Enterprises' conduct amounted to negligent supervision and retention of its employee or agent, Richard Smith.

■ Some of the claims in the Underlying Action clearly arise from acts that are not necessarily intentional. A negligent supervision and retention claim addresses the negligent acts and omissions of the employer (insured)—not the intentional acts of the employee. The issue is not whether exclusions for intentional or criminal acts are valid and not contrary to Nevada's public policy, as Plaintiff asserts. The relevant issue before this Court is whether the intentional or criminal acts of an employee exclude coverage for the employer's (insured) negligence or breach of contract. In contrast to the case law cited by Plaintiff, there is substantial case law that addresses the actual issue before this Court. In fact, other courts faced with analogous facts and very similar or identical "occurrence" and intentional act provisions like those before this Court, have found coverage for negligent hiring and supervision.

For example, where an insured corporation's employee sexually molested a minor child on the business premises, one federal court stated: "[I]f an injury occurs without the agency of the insured, it may be logically termed 'accidental,' even though it may be brought about designedly by another person.... The test of whether an injury is a result of an accident is to be *determined from the viewpoint of the insured* and not from the viewpoint of the one that committed the act causing the injury." *Silverball Amusement, Inc. v.* *Utah Home Fire Ins. Co.*, 842 F.Supp. 1151, 1157–58 (W.D.Ark.1994), aff'd, 33 F.3d 1476 (8th Cir.1994) (citations omitted)(emphasis added).

There are numerous analogous holdings from the Ninth Circuit and other jurisdictions. *See, e.g., Am. States Ins. Co. v. Borbor*, 826 F.2d 888, 895 (9th Cir.1987)(coverage for negligent supervision claim against co-owner of daycare center where other co-owner molested children); *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1223 (Alaska 2000) (claim that insured negligently failed to prevent claimant from being harmed by intentional act satisfied the "accident" requirement because "it is not unreasonable... (to) focus on the act attributed to (the insured seeking coverage), as distinct from the acts attributed (to someone else")); *Westfield Ins. Co. v. TWT, Inc.*, 723 F.Supp. 492, 495 (N.D.Cal.1989)(Negligent supervision could constitute an "occurrence" under the policy language); *Am. Employers Ins. Co. v. Doe*, 165 F.3d 1209, 1212 (8th Cir.1999)(coverage for diocese found for negligent supervision of priest who molested child); *Capital Alliance Ins. v. Thorough–Clean, Inc.*, 639 So.2d 1349, 1352 (Ala.1994)(coverage found for janitorial corporation whose employee used access gained through employment to commit rape; intentional act of employee could not be attributed to employer); *Lawson v. Straus*, 673 So.2d 223, 226 (La.App.1996) (coverage provided to medical clinic company after doctor employed by clinic sexually assaulted clinic employees); *Atl. Employers Ins. Co. v. Tots & Toddlers Pre-School Day Care Ctr., Inc.*, 239 N.J.Super. 276, 571 A.2d 300, 304 (App.Div.1990) (coverage found for negligent supervision claim against family-owned daycare center where husband molested children); *Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co.*, 109 N.C.App. 152, 426 S.E.2d 451, 456 (1993)(school covered for negligent su-

pervision of middle school basketball coach who raped student).

■ In addition to arguing that there was no "occurrence" under the language of the Policy, Plaintiff also argues that there was no "property damage" as that term is defined under the Policy. The Policy defines "property damage" as: (a) "physical injury to tangible property, including all resulting loss of use of that property...." or (b) "loss of use of tangible property that is not physically injured...." Specifically, Plaintiff argues that conversion or loss of a bank account does not amount to a loss of "tangible property." For this proposition Plaintiff cites *Johnson v. Amica Mutual Insurance Company*, 733 A.2d 977 (Me. 1999). Beyond a one sentence argument that a bank account is not property, Plaintiff only provides a cite and a block quote to support its argument.[2] The *Johnson* case cited by Plaintiff is, however, neither dispositive, nor even very persuasive.

First, in *Johnson* there was no transference of currency in its physical form. In the instant case, it appears that the money was in fact converted in its physical form.[3] That is, the victim Mr. Forte was taken to a bank by Richard Smith and the victim signed for the money, i.e., hard currency. The money was then converted by Smith. Thus, it appears that the definition of tangible property is satisfied here.

Second, Plaintiff fails to point out that the court in *Johnson* also found that "money (i.e., the currency itself) may constitute tangible property." *Johnson*, 733 A.2d at 979 (citing *Coulter v. CIGNA Property & Cas. Cos.*, 934 F.Supp. 1101, 1123 (N.D.Iowa 1996)("[M]oney might be considered 'tangible property' in situations where money has actually been destroyed or damaged."); *Security State Bank of Kansas City v. Aetna Cas. & Sur. Co.*, 825 F.Supp. 944, 947 (D.Kan.1993)("The destruction of a stack of currency could certainly be considered a destruction of tangible property. The moment it is destroyed[,] an irreversible loss of wealth has occurred. The destruction or loss of a

---

**2.** Plaintiff quotes the following excerpt from *Johnson v. Amica Mut. Ins. Co.*, 733 A.2d 977, 978 –979 (Me.,1999): [T]he allegedly converted bank account funds constitute intangible, rather than tangible, property. According to BLACK'S LAW DICTIONARY 809, 1456 (6th ed.1990): (1) "tangible property" is property with "physical form and substance" that "may be felt or touched, and is necessarily corporeal, although it may be either real or personal"; and (2) "intangible property" is property that has "no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises." Bank account funds are not "tangible property," because they have no physical presence. Rather, bank account funds are "intangible property," because they have no intrinsic value and merely represent, or are evidence of, value. Other courts have similarly concluded that bank account funds constitute intangible property. *See, e.g., Allstate Ins. Co. v. Russo*, 829 F.Supp. 24, 27 (D.R.I.1993) ("Bank deposits create a·debtor-creditor relationship between the bank and

the depositor. A deposit, therefore, is not held in specie in the bank's vaults for the depositor, but rather is an intangible chose in action.") (citations omitted); *Travelers Indem. Co. v. State*, 140 Ariz. 194, 680 P.2d 1255, 1257 (1984) ("The deposit of funds [in a bank] creates a debtor-creditor relationship between the bank and the depositor. A credit is a chose in action, and a chose in action is intangible property.") (citations omitted); *Cartwright v. Deposit Guar. Nat'l Bank*, 675 So.2d 847, 847–48 (Miss.1996) (stating that deposits into a bank account change form from tangible currency and checks into intangible accounting credits, and "money on deposit in a bank evidences a right of payment from the bank and is thus intangible in nature"); *Grochowski v. Larson (In re Estate of Larson)*, 196 Wis.2d 231, 538 N.W.2d 802, 803 (1995)."

**3.** It is not entirely clear from the parties' briefs that this is the case for all of the money. It is clear, however, that this is the case for substantial portions of the converted money.

check or other debt instrument is a different matter."); *Walker v. State Farm Fire & Cas. Co.,* 569 N.W.2d 542, 544 (Minn. App.1997) (distinguishing between loss of tangible currency and loss of intangible economic value of promissory note)).

## V. CONCLUSION

As previously noted, a federal court sitting in diversity must use its own best judgment in predicting how the state supreme court would interpret an insurance contract. *State Farm Mutual Auto. Insurance Co. v. Davis,* 937 F.2d 1415, 1418 (9th Cir.1991). The Nevada Supreme Court held in *Richfield Oil Corp. v. Harbor Insurance Company,* 85 Nev. 185, 452 P.2d 462, 466 (1969), that in construing an insurance contract "the terms of the parties should be taken and understood in their plain, ordinary and popular sense." Here, the plain terms of the Policy do not exclude the negligent acts of the Insured.

The weight of authority from other jurisdictions favors coverage under the Policy in this case. As this is a question of first impression in Nevada, this Court predicts the Nevada Supreme Court would find the reasoning of the multitude of cases cited above to be persuasive. Furthermore, under Nevada law an insurance policy should be interpreted broadly, affording the greatest possible coverage to the insured. *Harvey's Wagon Wheel v. MacSween,* 96 Nev. 215, 219–20, 606 P.2d 1095, 1098 (1980). Accordingly, the Court finds that the Nevada Supreme Court would likely find that when viewed from the perspective of the insured Equity Enterprises, the victim's injuries were not intended or expected but fit the definition of "occurrence" found in the Policy issued by the Plaintiff. Therefore, the exclusionary language pertaining to criminal or intentional acts does not negate coverage for the underlying claims of breach of contract, negligence, and negligent supervision and retention.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 7) is **GRANTED** in part. It is granted insofar as it pertains to coverage under the Policy for breach of contract, negligence, and negligent supervision and retention. Regarding special compensatory and punitive damages allowed by statute, Defendant concedes that these are excluded under the Policy.

**IT IS FURTHER ORDERED** that the parties are to bear their own costs and neither party is entitled to attorneys' fees.

**IT IS SO ORDERED.**