OPINION
{¶ 1} Appellant, Karen Havel ("Karen"), acting in her individual capacity and as co-administrator of the estate of Jessica Havel, appeals the judgment of the Geauga County Court of Common Pleas granting summary judgment in favor of appellees, David and Linda Chapek, ("Chapeks"), and in favor of intervening appellee, Grange Mutual Casualty Company ("Grange"). For the following reasons, we affirm in part, reverse in part and remand the matter.
 {¶ 2} This case arises out of the murder of Karen's daughter, Jessica Havel, by Jeremy Chapek, David and Linda Chapek's son. Jeremy murdered Jessica at her apartment in Mt. Lebanon, Pennsylvania, on the morning of May 16, 2002. Jeremy returned to Ohio where he committed suicide. On November 4, 2003, Karen and Mark Havel filed suit against the Chapeks asserting claims of negligence, survivorship, and wrongful death. An amended complaint was subsequently filed in which Mark Havel withdrew as a party and added a claim for punitive damages.
 {¶ 3} On April 7, 2004, Grange Mutual Casualty Company filed an intervenor's complaint against the Chapeks, seeking a declaration that Karen Havel's claims are not covered under the Grange homeowners insurance policy issued to the Chapeks and that Grange does not have a duty to defend the Chapeks under the terms of that policy.
 {¶ 4} On October 1, 2004, the Chapeks moved for summary judgment. The Chapeks argued that they had no duty to supervise or control the conduct of their adult son, who was twenty-two at the time of the murder, and that Jessica's murder was not a reasonable foreseeable event giving rise to a duty to warn Jessica or the police about Jeremy's intentions.
 {¶ 5} On October 15, 2004, Grange moved for summary judgment against the Chapeks. Grange argued that Karen's negligence claims are derivative of Jeremy's intentional act of murdering Jessica. Therefore, these claims do not constitute an "occurrence" or "accident" under the policy. Alternatively, Grange argued that Karen's claims are barred by policy exclusions for damage that was "expected or intended * * * by an insured" and for damage "arising out of * * * physical or mental abuse."
 {¶ 6} The following facts were set forth by Karen in response to Grange and the Chapeks' motions for summary judgment.
 {¶ 7} Jeremy was described by several witnesses as "unusual," "bizarre," "weird," and "strange." Jeremy was described as having an interest in witchcraft and Satanism. The walls of his room at home were decorated with a swastika, the numbers "666," the words "Lucifer is God," and other "satanic symbols." Jeremy owned a satanic bible and books about witchcraft. Jeremy had tattoos of a pentagram, a skull, and Marilyn Manson. Jeremy also owned weapons including knives, a set of brass knuckles, a 12 gauge shot gun, and a 9 millimeter handgun.
 {¶ 8} Evelyn Crombie, one of Jeremy's high school teachers, testified that Jeremy used to dress in black, and on several occasions she heard Jeremy make "expressions of violence." On one occasion, Jeremy wrote an essay that was "extremely violent." Crombie reported this essay to the high school principal and to Jeremy's mother. Crombie testified that his mother's reply was that Jeremy was expressing his artistic side and that his teachers did not understand his creativity.
 {¶ 9} In 1998, Jeremy began seeing a therapist. At this time, Jeremy was self-mutilating, i.e., cutting his arms. Jeremy was diagnosed with obsessive compulsive disorder and depression. Jeremy received regular counseling until his death and was taking Luvox, an antidepressant and antiobsessional drug. Jeremy ceased self-mutilating in 1999. Evidence indicated that in the months prior to Jeremy's death, the obsessive compulsive disorder was under control but the depression was "somewhat worse" due to stress. Jeremy was also suffering from recurrent nosebleeds and migraines before his death.
{¶ l0} In high school, Jeremy was diagnosed with a reading comprehension disability. Jeremy was tutored at home for part of his senior year but was able to graduate with his class in 1998.[1]
 {¶ ll} Jeremy and Jessica began dating when they were about fifteen years old while attending Ledgemont High School, in Thompson, Ohio. After her eighteenth birthday, Jessica moved into the Chapeks' home. In October 1999, Jeremy and Jessica moved into an apartment in Mt. Lebanon, Pennsylvania. Both Jeremy and Jessica worked in Pennsylvania and Jeremy attended the Art Institute of Pittsburgh. At one point, Jeremy and Jessica were engaged.
 {¶ 12} Acquaintances described Jeremy as very controlling and jealous of Jessica. Jeremy is said to have threatened to kill Jessica if she cheated on him. Linda was described as constantly meddling in Jeremy and Jessica's relationship, encouraging them to stay together and acting on Jeremy's behalf by calling Jessica directly when there were problems. When Jessica broke up with Jeremy, Linda is said to have "wished the worst" on Jessica.
 {¶ 13} In January 2002, Jessica decided to end their relationship and told Jeremy to leave the apartment. Jeremy contacted Linda and had her bring him back to Ohio, since Jeremy did not have a car. Thereafter, Jeremy lived at Linda and David's house. Karen had contact with Jeremy and Linda after the breakup with Jessica. Karen complained to Linda about Jeremy continuing to harass Jessica by calling her at work in Pennsylvania.
{¶ l4} At about 5:30 a.m., on the morning of May 16, 2002, as David was leaving for work, he discovered that Jeremy had taken Linda's vehicle and had left a book bag in the driveway. David moved the book bag to the garage. During the day, Linda noticed that the 12 gauge shot gun was missing from Jeremy's room. That afternoon, after police had contacted the Chapeks, the book bag was opened and found to contain shot gun shells, bullets, a dagger, wrist restraints and a ball gag.
{¶ l5} On this morning, Jeremy had taken Linda's vehicle and driven to Mt. Lebanon, where he murdered Jessica by a combination of beating, stabbing, and strangulation. The attack on Jessica occurred at about 8:00 a.m. Thereafter, Jeremy returned to Ohio where he killed himself with a shot gun at Hell Hallow Wilderness area.
{¶ l6} In separate judgment entries, journalized on November 18, 2004, the trial court granted summary judgment in favor of Grange and the Chapeks. This appeal timely follows.
 {¶ 17} Karen Havel raised the following assignments of error:
{¶ l8} "[1.] The trial court erred in granting Grange Mutual Casualty Company's motion for summary judgment.
{¶ l9} "[2.] The trial court erred in granting summary judgment in favor of defendants David and Linda Chapek as there exists genuine issues of material fact as to their control of and responsibility for their son's conduct."
 {¶ 20} Pursuant to Civ.R. 56(C), summary judgment is proper when: (1) the evidence shows "that there is no genuine issue of material fact" to be litigated, (2) `[t]he moving party is entitled to judgment as a matter of law," and (3) "it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor."
 {¶ 21} Unlike factual questions which must be construed in favor of the non-moving party, the interpretation of an insurance contract is a question of law. Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,73 Ohio St.3d 107, 108, 1995-Ohio-214.
 {¶ 22} A trial court's decision to grant summary judgment, like other questions of law, is reviewed by an appellate court under a de novo standard of review. Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105,1996-Ohio-336. A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision. Brown v. Cty. Commrs. of SciotoCty. (1993), 87 Ohio App.3d 704, 711. (Citation omitted.)
 {¶ 23} Under the first assignment of error, Karen argues that the trial court erred in its determination that there is no coverage under the Grange homeowner's policy for Karen's claims against the Chapeks. We agree.
 {¶ 24} The homeowners policy issued to the Chapeks by Grange provides personal liability protection as follows: "[Grange] will pay all sums * * * arising out of any one loss for which an insured person becomes legally obligated to pay as damages because of bodily injury * * * caused by an occurrence." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury * * *." The relevant coverage exclusions are as follows: Grange will not cover "[b]odily injury * * * arising out of the * * * negligent entrustment of * * * motor vehicles;" "[b]odily injury * * * expected or intended by an insured person;" and "[b]odily injury * * * arising out of sexual molestation, or any sexual activity, corporal punishment, or physical or mental abuse."
 {¶ 25} The initial question is whether Karen's negligence claims constitute an "occurrence" under the Grange policy. We hold that it does.
 {¶ 26} Grange argues that bodily injury claims arising from an intentional act, such as murder, do not constitute an accidental occurrence for the reason that "murder is not an accidental event." Grange cites to several appellate decisions for the proposition that intentional acts including murder and sexual molestation "do not constitute `occurrences' for purposes of determining liability insurance coverage." Ohio Farmers Ins. Co. v. Perry (Aug. 8, 1997), 11th Dist. No. 96-A-0065, 1997 Ohio App. LEXIS 3580, at 12. (Citations omitted.) See, also, cited, Dunn v. North Star Resources, Inc., 8th Dist. No. 79455, 2002-Ohio-4570 (sexual harassment not an "occurrence"); Offhaus v.Guthrie (2000), 140 Ohio App.3d 90 (murder not an "occurrence");Aguiar v. Tallman (Mar. 15, 1999), 7th Dist. No. 97 C.A. 116, 1999 Ohio App. LEXIS 985 (battery not an "occurrence").
 {¶ 27} All the cases cited by Grange rely on one or both of the Ohio Supreme Court's decisions in Gearing v. Nationwide Ins. Co.,76 Ohio St.3d 34, 1996-Ohio-113, and Cuervo v. Cincinnati Ins. Co.,76 Ohio St.3d 41, 1996-Ohio-99. The cases cited by Grange were also decided before the Ohio Supreme Court's decision in Doe v. Shaffer,90 Ohio St.3d 388, 200-Ohio-186, which modified both Gearing andCuervo. Therefore, the validity of Grange's precedent must be considered in light of the Doe decision.
 {¶ 28} In Doe, the plaintiffs were the representatives of a mentally retarded man who had been sexually molested and had contracted AIDS while the resident of a residential care facility operated by the Catholic Diocese of Columbus. The plaintiffs' suit included claims of negligent supervision. Interstate Fire Casualty Company, the liability coverage provider for the Diocese, intervened and moved for summary judgment seeking a declaration that it had no duty to indemnify or defend the Diocese. Interstate was granted summary judgment "on the grounds that public policy barred coverage both for intentional acts of sexual molestation and for negligence claims that flowed from the molestation." Id. at 390.
 {¶ 29} The issue before the Ohio Supreme Court was stated as follows: "whether the public policy precluding liability insurance coverage for acts of sexual molestation also prohibits coverage for a nonmolester for related claims alleging negligent supervision, negligent retention, and negligent failure to warn." Id. The court held that "Ohio public policy permits a party to obtain liability insurance coverage for negligence related to sexual molestation when that party has not committed the act of sexual molestation." Id. at syllabus.
 {¶ 30} Grange argues that the Doe decision must be construed narrowly as only considering whether Ohio public policy forbade negligence claims related to intentional conduct, not whether such claims constitute an "occurrence" in a liability policy.
 {¶ 31} Doe considered whether the act of negligently supervising a third party who commits intentional, criminal conduct is the functional equivalent of committing the intentional conduct itself for public policy purposes. The court found this proposition to be an "untenable" extension of public policy. Id. at 393. "This is so because the intentions of the molester are immaterial to determining whether the allegedly negligent party has coverage." Id. The Ohio Supreme Court expressly adopted the reasoning of the federal district court inSilverball Amusement, Inc. v. Utah Home Fire Ins. Co. (W.D.Ark. 1994),842 F.Supp. 1151, affirmed (C.A.8, 1994), 33 F.3d 1476, which "reasoned that the intentions or expectations of the negligent insured must control the coverage determination, and not the intentions or expectations of the molester." Id., citing 842 F.Supp. at 1160.[2] The Ohio Supreme Court further held, in consideration of the policy languageitself, as follows: "A contrary interpretation that refuses to distinguish between the abuser's intentional conduct and the insured's alleged negligence would impermissibly ignore the plain language of an insurance policy that excludes from coverage bodily injury that was expected or intended from the standpoint of the insured." Id. at 394.
 {¶ 32} In the present case, the fact that Jessica's murder was the intentional act of Jeremy Chapek does not preclude coverage for Linda and David Chapek's allegedly negligent conduct in failing to supervise Jeremy.
 {¶ 33} The Grange policy defines "occurrence" as an "accident," but does not define "accident." This court, consistently with other courts, has defined "accident" as "an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence." Chepke v.Lutheran Brotherhood (1995), 103 Ohio App.3d 508, 511, citing Black's Law Dictionary (5 Ed.Rev. 1979) 14; cf. Randolf v. Grange Mut. Cas.Co. (1979), 57 Ohio St.2d 25, 29 ("the word `occurrence,' defined as an `accident,' was intended to mean just that — an unexpected, unforeseeable event") [from the prospective of the insured — in this case the Chapeks].
 {¶ 34} From the standpoint of the Chapeks, Jessica's murder was an unexpected, unforeseeable event and so constitutes an "occurrence" under the Grange policy. See W. Am. Ins. Co. v. Embry (Apr. 25, 2005), W.D.Ky. No. 3:04CV-47-H, 2005 U.S. Dist. LEXIS 9387, at 5-6 ("the negligent supervision of a child would constitute an `occurrence' within the language of the policy"); Farmer v. Allstate Ins. Co. (C.D.Ca. 2004),311 F.Supp.2d 884, 893 ("[negligent supervision could constitute an `occurrence' under the policy language." (Citation omitted.) CapitolIndemn. Corp. v. Wright (D.Nev. 2004), 341 F.Supp.2d 1152, at 1158-1159 (citing decisions from other jurisdictions).
 {¶ 35} The next question is whether any of the exclusions to coverage in the Grange policy apply. Grange argues that the exclusions for "[b]odily injury * * * expected or intended by any insured person" and for "[b]odily injury * * * arising out of * * * physical * * * abuse" apply to deny the Chapeks coverage. This is contrary to the Ohio Supreme Court's holding under Doe and is inconsistent with the Supreme Court's holding in Automobile Club Ins. Co. v. Mills, 90 Ohio St.3d 574, 2001-Ohio-21, which extended the public policy position adopted in Doe to wrongful death, as well as molestation. Doe distinguished its analysis as to any intentional act of an insured, but permitted appellant to obtain coverage for negligence related to the sexual molestation when they did not commit the molestation. Doe at syllabus. Grange's attempt to parse and dissect each individual intentional act for coverage is misplaced; i.e., negligence for sexual molestation is covered but, negligence in wrongful death is not. Each insured's individual coverage under the Grange policy must be applied separately to each insured. The physical abuse and bodily injury exclusion in question only applies to an insured who actually commits an intentional act — in this case, Jeremy, who committed murder. The exclusion does not apply to potentially innocent negligent insured's, such as Jeremy's parents, who may have negligently contributed to the injury through failure to warn or protect. Pursuant to the holdings in Doe and Automobile Club, Jeremy's parents have coverage and Grange has an absolute duty to defend under the policy.
 {¶ 36} Clearly, the intentional act of Jeremy in this instance is equivalent to the sexual molester in Doe. Jeremy is not a covered insured, but, the Chapeks, like the Catholic Diocese in Doe, have coverage.
 {¶ 37} As it relates to his parents, Jeremy's unexpected act was clearly an "occurrence" as defined in the Grange policy. The dissent would deny coverage for the negligent acts of an innocent insured, due to the intentional, criminal act of another insured. In effect, the dissent would deny coverage for the very purpose for which insurance is purchased, i.e., negligence resulting in bodily injury.
 {¶ 38} Further, the holding in Bocook v. Sandy Beaver Valley FarmersMut. Ins. Co., 4th App. No. 02CA4, 2002-Ohio-6307, relied on by the dissent, has been superseded by those in Doe and Automobile Club.
 {¶ 39} The exclusion for intentional acts of physical abuse and bodily injury does not apply to innocent negligent insureds. There is a distinct difference between having coverage available under a policy and actually being liable for damages under that same policy.
 {¶ 40} We do not find that this exclusion would have prevented coverage for Karen's claims against the Chapeks.
 {¶ 41} Karen's first assignment of error is with merit.
 {¶ 42} Under the second assignment of error, Karen maintains that the genuine issues of material fact exist precluding the granting of summary judgment in favor of the Chapeks on her negligence claims. "To establish actionable negligence, one must show * * * the existence of a duty, a breach of that duty and injury resulting proximately therefrom."Mussivand v. David (1989), 45 Ohio St.3d 314, 318. We begin by considering the duty the Chapeks owed to Jessica for the actions of their son, Jeremy.
 {¶ 43} "At common law, a parent is not ordinary liable for damages caused by a child's wrongful conduct. However, liability can attach when the injury committed by the child is the foreseeable consequence of a parent's negligent act. In those circumstances, liability arises from the conduct of the parent." Huston v. Konieczny (1990),52 Ohio St.3d 214, at syllabus.
 {¶ 44} A child remains under the care and control of its parents until the age of majority, defined in Ohio, as the age of eighteen years. R.C.3109.01 ("[a]ll persons of the age of eighteen years * * * are of full age for all purposes"). It follows then, that a parent is only liable for the "foreseeable consequences" of their negligence in supervising their children during their minority.
 {¶ 45} Stated otherwise, "there is no duty under Ohio law to control the conduct of another person so as to prevent him from causing physical harm to another unless a `special relation' exists between the actor and that person which imposes a duty upon the actor to control the person's conduct." Littleton v. Good Samaritan Hosp. Health Ctr. (1988),39 Ohio St.3d 86, 92, (citations omitted). Such a "special relationship" exists between a parent and a minor child. See 2 Restatement of the Law 2d, Torts (1965), Section 316; approved Huston, 52 Ohio St.3d at 218, cf. R.C. 3109.10) "[a]ny person is entitled to maintain an action to recover compensatory damages in a civil action * * * from the parent of a child under the age of eighteen if the child * * * assaults the person").
 {¶ 46} Jeremy was twenty-two years old at the time he murdered Jessica and, presumably, emancipated from the control of his parents. Karen argues that Jeremy should not be considered emancipated because he was under a "legal disability," specifically, that Jeremy was of "unsound mind." R.C. 3109.01.[3] The term of "unsound mind" is statutorily defined to include "all forms of mental retardation or derangement." R.C. 1.02(C). Mental retardation entails "significantly subaverage general intellectual functioning" and derangement "has been equated with insanity." Fisher v. Ohio Univ. (1992), 63 Ohio St.3d 484, 488
(Citations omitted).
 {¶ 47} In support of her claim that Jeremy was of unsound mind, Karen cites to evidence that Jeremy was under a learning disability, practiced self-mutilation, displayed a propensity toward violence, and lacked the ability to live independently of a care-giver, a role alternatively played by Jessica and his mother.
 {¶ 48} This evidence fails to raise any issue regarding the soundness of Jeremy's mind and his learning disability involving reading comprehension. Although the disability required Jeremy to receive individual tutoring during his senior year of high school, it did not prevent Jeremy from graduating high school with his class or from attending college. Jeremy had not practiced self-mutilation since 1999, and the evidence of a propensity toward violence, as will be discussed further below, is slight. Jeremy was diagnosed with depression and obsessive compulsive disorder, both relatively common mental illnesses. The evidence shows that the obsessive compulsive disorder was being controlled and that the depression was being treated. Finally, the fact that Jeremy lived his adult life with either his mother or girlfriend Jessica, and even depended on them for financial assistance or for transportation, does not raise an issue regarding the soundness of Jeremy's mind. Living with a girlfriend or one's parent after reaching the age of eighteen is a common situation. Without evidence that such an arrangement was necessary for Jeremy to function in the world, this living arrangement has no bearing on his emancipation.
 {¶ 49} Accordingly, Jeremy was an emancipated adult at the time he committed the murder. The Chapeks were under no duty to Jessica by virtue of being his parents.
 {¶ 50} However, Ohio law also imposes a duty in the following situation: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Morgan v. FairfieldFamily Counseling Ctr. 77 Ohio St.3d 284, 294, citing 2 Restatement of the law 2d, Torts, Section 319. Karen maintains that the Chapeks knew of and encouraged Jeremy's violent propensities toward Jessica.
 {¶ 51} The evidence does not support these assertions. The most significant evidence against Karen's claims is the fact that Jeremy had no history of violent behavior toward anyone except himself. Jeremy had no criminal record and no record of being disciplined at school for violent behavior. For a period of one to two years Jeremy would cut his own arms. However, this activity occurred three years prior to Jessica's murder and ceased when Jeremy began therapy and was prescribed Luvox. Jeremy had not evidenced violence toward others, only himself.
 {¶ 52} Jeremy's threat "to kill" Jessica if she cheated on him also fails to raise an issue whether Jessica's murder was reasonably foreseeable. This conditional threat was made to a friend of Jessica's while Jeremy and Jessica were still in high school and there is no evidence that the Chapeks were aware of it. "In the absence of allegations that [the husband] had in the past used or threatened to use physical violence against [the wife], or that [the husband] had communicated to defendants any thought of physical violence against [the wife] in response to her decision to leave, there would have been no reason for defendants to have concluded that he would use violence in this instance, notwithstanding his access to weapons and his professed desire to prevent her departure by any means." Cf. Hansra v. SuperiorCourt (Cal.App. 1992), 7 Cal.App.4th 630, 642.
 {¶ 53} The allegations of violent expressions are too vague to be probative of the likelihood of Jeremy causing harm to another. Moreover, like the self-mutilation and threat to kill Jessica, this evidence relates to events that occurred years before Jessica's murder.
 {¶ 54} Finally, Jeremy's bizarre behavior and dress, tattoos, swastika and occult interest are no real indicators that Jeremy was likely to cause bodily harm if not controlled. What is lacking in Karen's evidence is a connection between these symbols and an identifiable propensity for or pattern of violent behavior.
 {¶ 55} The critical period for signs that Jeremy was likely to inflict harm on Jessica is the period from January 2002, when Jessica broke up with Jeremy, to May 2002. Prior to January 2002, Jeremy was living apart from his parents with Jessica in Pennsylvania. He moved in January and murdered her in May 2002. Looking at this five-month period, there is very little evidence that Jeremy would violently assault Jessica. Jeremy left the Mt. Lebanon apartment when asked or told to by Jessica and did not return to Pennsylvania until the day he murdered Jessica. In the months prior to breaking up, Jeremy's therapist noted that his depression was "somewhat worse" due to stress. Karen testified that Jeremy would harass Jessica by calling her at work. The nature of Jeremy's harassment was annoying rather than threatening. According to Karen, Jeremy would ask how Jessica was doing or what she was doing when he called on these occasions. Karen's interaction with Jeremy after the breakup with Jessica was civil. After returning to Ohio, Jeremy found work, went out with friends, and continued to take college courses over the Internet. During this time, the Chapeks testified they allowed Jeremy to come and go as he pleased. Otherwise, there is no evidence of a dramatic change in Jeremy's disposition that would portend the violence of May 16, 2002.
 {¶ 56} The evidence that Jeremy's mother encouraged his "demented obsession" with Jessica is too highly circumstantial to create an issue. The attempt by plaintiffs to elevate the Chapeks support of their son to co-conspirator culpability is not justified in the evidence. This record falls far short of creating an issue whether his mother actively encouraged Jeremy to murder Jessica.
 {¶ 57} Karen relies on the factually similar case in Volpe v.Gallagher (R.I. 2003), 821 A.2d 699, to argue that the evidence before this court is sufficient to support a claim for negligence. InVolpe, the defendant allowed her mentally ill, adult son to live with her. The son did not have a violent or criminal history. The defendant was sued for negligence when the son shot and killed a neighbor with a gun that he was allowed to keep. The jury found for the plaintiffs and the Rhode Island Supreme Court upheld the decision.
 {¶ 58} Volpe is distinguishable in key respects. The son inVolpe did not suffer from mere depression, but was paranoid and delusional, "sit[ting] by himself in the darkness carrying on conversations with imaginary companions." The son in Volpe had also been previously institutionalized for his mental illness and underwent two years of outpatient treatment during which time his condition worsened. Id., at 708-709.
 {¶ 59} In Volpe, the mother's liability rested on the duty "to prevent those whom [one] allow[s] to use their property from doing so in a manner that creates an unreasonable risk of harm to others in situations in which the possessors are able to exercise such control." Id. at 711. In other words, the mother's liability derived from her status as a possessor of land.[4] See 2 Restatement of the Law 2d, Torts, Section 318. In this case, the Chapeks' liability would derive from their alleged act of "taking charge" of one whom they knew or should have known was likely to cause harm to another. 2 Restatement of the Law 2d, Torts, Section 319. The distinction is important. Inherent in the possession of land is the ability and the necessity of exercising control over those premises. By allowing Jeremy to live with them, the Chapeks did not thereby "take charge" of Jeremy, creating a presumption the ability or the duty for his care and control. "Liability for the negligent acts of a third party is not ordinarily imposed unless the defendant has the authority, as well as the ability, to control that party's actions; the mere fact that the defendant could have exercised that control `as a practical matter' does not create a duty to do so."Harstock v. Harstock (N.Y.App. 1993), 189 A.D.2d 993, 993-994;Kaminski v. Fairfield (Conn. 1990), 578 N.E.2d 1048, 1052 ("[n]either the defendant nor our own research has disclosed any case in which a parent, merely by making a home for an adult child who has a mental disorder, has been held to be `[o]ne who takes charge of a third person' for the purposes of § 319 [of the Restatement 2d of Torts]"); Alioto v.Marnell (Mass. 1988), 520 N.E, 2d 1284, 1286 ("[t]he fortuity of his living in their home does not create a duty where none otherwise exists; nor does their status as parents, without more, impose on the defendants the duty to supervise and control their emancipated adult son").
 {¶ 60} A third distinguishing feature of the Volpe decision is the great emphasis the court placed on the mother's negligence in allowing her son to have access to firearms on her property, which the son used to commit the murder. The court noted that "a person who allows deadly firearms to be stored on his or her property `is held to the highest standard of due care'." 821 A.2d at 712 (Citation omitted.); also, Id. at 710 ("'Whom the Gods would destroy, they first make mad.' * * * [I]n this case, defendant * * * then allows such an individual to keep guns and ammunition on their property, whereupon he eventually destroys not only himself but one or more other lives.") (Citations omitted.) In the present case, the Chapeks did allow Jeremy to keep firearms on their property. However, there is no evidence that firearms played any part in Jessica's murder, which was by beating, strangulation, and incision.
 {¶ 61} For the foregoing reasons, Karen has failed to raise an issue whether Jessica's murder was a reasonably foreseeable event or that the Chapeks had "taken charge" of Jeremy so as to be liable for his conduct. Karen's second assignment of error is without merit.
 {¶ 62} The judgment of the Geauga County Court of Common Pleas, granting summary judgment in favor of appellees, David and Linda Chapek, is affirmed. The judgment in favor of intervening plaintiff-appellee, Grange Mutual Casualty Company, is reversed. The matter is hereby remanded for proceedings consistent with this opinion.
[1] In her appellate brief, Karen states that, "due to Jeremy's bizarre and violent behavior, he had to be home-schooled." This statement is not supported by the record. Crombie's affidavit states, "Jeremy was removed from school and placed on home tutoring. Mrs. Malobinski [the principal] indicated to me that this was the result of a violent incident that occurred at home." A violent incident that occurred at home does not equate to "bizarre and violent behavior" at school. Moreover, anything Mrs. Malobinski "indicated" to Crombie is inadmissible hearsay.
[2] The Ohio Supreme Court quotes, in full, the following elaboration of the Silverball court's reasoning: "The ultimate effect of [those opinions denying coverage] leads to a metamorphosis in which certain negligent actions are transformed by the court into intentional actions for the purposes of deciding negligent hiring cases involving sexual abuse. Such a decision effectively dissolved the distinction between intentional and negligent conduct, allowing the intentional act to devour the negligent act for the purpose of determining coverage. The correct method of analyzing this issue in cases with the factual setting and insurance policy provision involved * * * would deal with each act on its own merits and recognize that employers who make negligent hiring decision clearly do not intend the employees to inflict harm."90 Ohio St.3d at 393-394, citing Silverball, 842 F. Supp. at 1163.
[3] The Term "legal disability" is not defined in R.C. Chapter 3109. In other contexts, such as proceedings in probate court and for the purposes of tolling the statute of limitation, being of "unsound mind" constitutes a "legal disability." See R.C. 2131.02; R.C. 2305.16.
[4] The court in Volpe was careful to particularly identify the mother's liability as deriving from her status as a possessor of land: "defendant's liability in this case does not stem from the fact that, because she was Gallagher's mother and because Gallagher was living with her as an adult when he was mentally ill, therefore she necessarily had the ability and the duty to control his behavior." 821 A.2d at 711.
WILLIAM M. O'NEILL, J., concurs,
DIANE V. GRENDELL, J., concurs in part and dissents in part with a Dissenting Opinion.